14-1417

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

───────────────

ODORSTAR TECHNOLOGY LLC,
KINPAK, INC.,

*Plaintiffs-Appellants,*

v.

SMM DISTRIBUTORS LLC,
SMM MANUFACTURING, INC.,

*Defendants-Appellees.*

───────────────

**Appeal from the United States District Court for the**
**Southern District of Florida in No. 0:13-cv-60136-DMM,**
**Judge Donald M. Middlebrooks**

───────────────

**BRIEF FOR ODORSTAR TECHNOLOGY LLC, AND KINPAK, INC.**

───────────────

Patrick J. Coyne
FINNEGAN, HENDERSON,
  FARABOW, GARRETT &
  DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C.  20001-4413
(202) 408-4000

July 16, 2014

*Attorney for Plaintiffs-Appellants,*
*Odorstar Technology LLC, and*
*Kinpak, Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Plaintiffs-Appellants, Odorstar Technology LLC, and Kinpak, Inc., certifies the following:

1.    The full names of every party or amicus represented by me is:

        Odorstar Technology LLC, and Kinpak, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

        N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

        None

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

        Garrett Ari Barten,
        John Christopher
        CHRISTOPHER & WEISBERG, P.A.

        Patrick J. Coyne
        FINNEGAN, HENDERSON, FARABOW,
         GARRETT & DUNNER, LLP

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................................................................i

STATEMENT OF RELATED CASES ................................................ viii

I.      JURISDICTIONAL STATEMENT ................................................1

II.     STATEMENT OF THE ISSUES .....................................................2

III.    STATEMENT OF THE CASE ........................................................3

      A.      Preliminary Statement .........................................................3

      B.      Overview of the Technology ................................................5

      C.      The Girard '661 Patent ........................................................7

            1.      The Specification Teaches That the Wick Member
                    May, But Need Not, Extend Outside the Membrane
                    Shell...............................................................................7

            2.      The Specification Discloses a Structure In Which an
                    Acid Component Is Wrapped In Wicking Material and
                    Fully Enclosed Within the Membrane Shell............................10

            3.      The Specification Teaches a Mechanism for Wicking
                      Action That Does Not Require the "Wick Means" to
                    Directly Contact Water Outside the Device .............................13

      D.      The Claims on Appeal ........................................................14

      E.      The Accused "Shocker" Products .......................................16

      F.      Course of the Proceedings ..................................................18

      G.      The District Court's Claim-Construction Ruling Diverges
            From the Specification In Critical Respects........................19

IV.     SUMMARY OF THE ARGUMENT ...........................................22

V.      ARGUMENT...............................................................................26

      A.      The Claim Construction Is Reviewed *De Novo* ..................26

B.    The Legal Principles Governing Claim Construction Are
      Well-Established ............................................................................26

C.    The District Court Misconstrued the Claimed Function of
      the "Wick Means" ..........................................................................30

D.    The District Court Misconstrued the Structure of the Wick
      Means Disclosed in the Specification That Performs This
      Absorbing and Transporting Function ...............................................35

E.    The District Court Erred In Construing "Connected To" in a
      Manner that Expressly Contradicts the Specification ........................40

F.    The District Court Erred by Importing Limitations from the
      Specification into the Claims ..........................................................42

G.    Principles of Claim Differentiation Confirm That the District
      Court Erred in its Construction ........................................................44

H.    The District Court Failed to Follow This Court's Established
      Framework for Claim Construction ...................................................46

VI.   CONCLUSION..................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acromed Corp. v. Sofamor Danek Grp., Inc.*,
253 F.3d 1371 (Fed. Cir. 2002) .................................................................35, 37

*Activevideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ........................................................................26

*Acumed LLC v. Stryker Corp.*,
483 F.3d 800 (Fed. Cir. 2007) ...............................................................26, 27, 44

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003) .................................................................35, 36

*Ancora Techs., Inc. v. Apple, Inc.*,
744 F.3d 732 (Fed. Cir. 2014) ....................................................25, 28, 46, 49

*In re Aoyama*,
656 F.3d 1293 (Fed. Cir. 2011) ......................................................19, 30, 31, 35

*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
726 F.3d 1296 (Fed. Cir. 2013) ........................................................................29

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
334 F.3d 1294 (Fed. Cir. 2003) ........................................................................33

*Callicrate v. Wadsworth Mfg., Inc.*,
427 F.3d 1361 (Fed. Cir. 2005) .....................................................35, 36, 37, 43

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
677 F.3d 1361 (Fed. Cir. 2012) ........................................................................30

*Comark Commc'ns v. Harris Corp.*,
156 F.3d 1181 (Fed. Cir. 1998) ........................................................................44

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
717 F.3d 1336 (Fed. Cir. 2013) .................................................................29, 33

*E-Pass Technologies, Inc. v. 3Com Corp.*,
343 F.3d 1364 (Fed. Cir. 2003) .................................................................47, 48

iv

*Ecolab Inc. v. Paraclipse, Inc.*,
   285 F.3d 1362 (Fed. Cir. 2002) ..........................................................44

*Eolas Techs. Inc. v. Microsoft Corp.*,
   399 F.3d 1325 (Fed. Cir. 2005) ..........................................................43

*Epistar Corp. v. Int'l Trade Comm'n*,
   566 F.3d 1321 (Fed. Cir. 2009) ..........................................................27

*Golight Inc. v. Wal-Mart Stores, Inc.*,
   355 F.3d 1327 (Fed. Cir. 2004) ..........................................................48

*JWW Enters., Inc. v. Interact Accessories, Inc.*,
   424 F.3d 1324 (Fed. Cir. 2005) ..........................................................33

*Laryngeal Mask Co. Ltd. v. Ambu A/S*,
   618 F.3d 1367 (Fed. Cir. 2010) ....................................................46, 47

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ......................................................44, 48

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
   744 F.3d 1272 (Fed. Cir. 2014) ..........................................................26

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) ..............................................................21

*McCarty v. Lehigh Valley R.R. Co.*,
   160 U.S. 110 (1895).............................................................................30

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005) ..........................................................28

*Micro Chem., Inc. v. Great Plains Chemical Co.*,
   194 F.3d 1250 (Fed. Cir. 1999) ....................................................30, 33

*Nomos Corp. v. BrainLAB USA, Inc.*,
   357 F.3d 1364 (Fed. Cir. 2004) ..........................................................24

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ..........................................................27

*In re Paulsen*,
 30 F.3d 1475 (Fed. Cir. 1994) ...........................................................28

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) ...................................................*passim*

*SkinMedica, Inc. v. Histogen, Inc.*,
 727 F.3d 1187 (Fed. Cir. 2013) .......................................................28

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
 775 F.2d 1107 (Fed. Cir. 1985) .......................................................48

*SunRace Roots Enter. Co. v. SRAM Corp.*,
 336 F.3d 1298 (Fed. Cir. 2003) .......................................................44

*Tandon Corp. v. U.S. Int'l Trade Comm'n*,
 831 F.2d 1017 (Fed. Cir. 1987) .......................................................44

*Teleflex Inc. v. Ficosa N.A. Corp.*,
 299 F.3d 1313 (Fed. Cir. 2002) .......................................28, 29, 44

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
 723 F.3d 1363 (Fed. Cir. 2013) ..............................................28, 29

*Thorner v. Sony Computer Entm't Am., LLC*,
 669 F.3d 1362 (Fed. Cir. 2012) .......................................................28

*Trading Tech. Int'l., Inc. v. eSpeed, Inc.*,
 595 F.3d 1340 (Fed. Cir. 2010) .......................................................50

*Uship Intellectual Props., LLC v. United States*,
 714 F.3d 1311 (Fed. Cir. 2013) .......................................................27

*Vitronics Corp. v. Conceptronic, Inc.*,
 90 F.3d 1576 (Fed. Cir. 1996) ...................................................26, 28

*Welker Bearing Co. v. PHD, Inc.*,
 550 F.3d 1090 (Fed. Cir. 2008) .......................................35, 37, 38

*Wenger Mfg., Inc. v. Coating Mach Sys., Inc.*,
 239 F.3d 1225 (Fed. Cir. 2001) ..............................................35, 44

**Federal Statutes**

28 U.S.C. § 1295 ................................................................................1

28 U.S.C. § 1331 ................................................................................1

28 U.S.C. § 1338 ...............................................................................1

35 U.S.C. § 112 ...........................................................................15, 35

## **STATEMENT OF RELATED CASES**

No other appeal in or from this action was previously before this or any other appellate court.

## I.    JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. Based on the district court's Order granting SMM's[1] corrected motion for summary judgment, A2-19, the district court entered a Final Judgment of noninfringement on January 27, 2014, A1. Odorstar's[2] Notice of Appeal was timely filed on February 25, 2014. A1379-80. This Court has jurisdiction under 28 U.S.C. §§ 1295 and 1338.

---

[1]    "SSM" refers collectively to the Defendants-Appellees, SMM Distributors LLC, and SMM Manufacturing, Inc.

[2]    "Odorstar" refers collectively to the Plaintiffs-Appellants, Odorstar Technology LLC, and Kinpak, Inc.

## II.    STATEMENT OF THE ISSUES

The claims define the scope of a patented invention. The claims of Girard, U.S. Patent No. 6,764,661 ("the '661 patent"), are not limited to its preferred embodiments. This broader construction of "wick means" and "connected to" are supported by the express disclosure of the specification as originally filed. The Applicant neither gave these terms a clear limiting definition, nor made clear and unmistakable disavowal of their common, ordinary definitions either in the specification or during prosecution.

A.    Did the district court err in limiting the term "wick means" to "a wick member that extends beyond the outermost edge of the shell, or, at the very least, is flush with the membrane shell but is nevertheless directly exposed to water on the outside of the shell," based on the preferred embodiments of the invention?

B.    Did the district court err in construing the term "connected to" as requiring the "wick means" to have "some sort of link with the membrane shell," in spite of the express disclosure in the specification that "connected to" may include "being merely inserted into the compartment"?

2

## III.    STATEMENT OF THE CASE

### A.    Preliminary Statement

The principal issue in this appeal is whether the claims can be limited to preferred embodiments based on implication or whether, as required by settled law of this Circuit, the claims must be given a broader meaning supported by the specification. The district court construed the "wick means" and "connected to" limitations consistent with the preferred embodiments. These limitations can be imposed only where the inventor has (1) clearly defined the terms narrowly, or (2) made a clear and unmistakable disavowal of the broader claim scope. The inventor here has done neither. Rather, the specification clearly defines the broader scope.

Each preferred embodiment includes a wick member **24** extending beyond the outermost edge **40** of a membrane shell **22**. *See e.g.*, A32, FIG. 1. As depicted in the Figures of the '661 patent, wick member **24** extends outside the membrane shell, and absorbs and transports water into compartment **30**. A46, 6:24-28. The specification discloses other configurations of the wick means that do not require it to extend outside the shell. The specification discloses the wick as broader than the preferred embodiments. "The wick member 24 can be . . . ***merely inserted into*** the compartment 30." A46, 6:33-36 (emphasis added). The specification also discloses acid component **34**, wrapped in the same wicking material and performing a wicking action, also fully enclosed within the compartment. A50, 13:56-60. In both

3

instances, water is transported through a permeable membrane shell and absorbed by these wicking materials which absorb and transport water inside the compartment. A47, 8:54-57; A48, 9:51-53. The specification establishes that the wick means can, but need not, extend outside the shell.

The claims of the '661 patent are not limited to the preferred embodiments. The claimed "wick means" is for "absorbing water and transporting water into said compartment." A54, 21:46-54 (claim 1). Claim 1 includes no functional requirement that the wick means absorb water outside the compartment. Rather, it requires merely that the wick means absorb and transport water into the compartment. Given that the wick means can be "merely inserted into the compartment," A46, 6:34-37, the claimed absorbing and transporting may be entirely within the compartment. "Wick means" is broad enough to cover absorbing water that has entered the compartment through a water-permeable membrane shell, and then transporting water within the shell.

The district court, however, construed not the claimed function but a "function properly reflect[ing] that which is in the specification." A9. In doing so, the district court imported from the preferred embodiments two functional limitations that are not recited in the claims. First, the district court required that water be absorbed by the wick means outside the shell. A9-10. Second, the district court required that the absorbed water be transported by the wick means from a

4

point outside the shell to a point inside the shell. A9-10. As a consequence of adding these functional limitations, the district court limited the corresponding structure of wick member **24** to the preferred embodiments depicted in the Figures that absorb water outside the shell and transport it into the shell. A11.

The '661 patent expressly describes what it means by "connected to." Despite the patent's explicit disclosure that "[t]he wick member **24** can be connected to the membrane shell **22** by . . . being ***merely inserted into*** the compartment **30**," A46, 6:33-36 (emphasis added), the district court required the claimed "wick means" to have "some sort of link with the membrane shell," in addition to "being merely inserted into the compartment." A11.

Based on these constructions of "wick means" and "connected to," the district court denied Odorstar's motion for summary judgment of infringement, granted SMM's motion for summary judgment of noninfringement, and entered Final Judgment in favor of SMM. A1; A19. Odorstar urges this Court to reverse the district court's construction and remand the case to the district court for further proceedings consistent with a proper construction of the claims.

## B.    Overview of the Technology

Deodorizers operate by releasing chlorine dioxide gas in a controlled manner. Upon contact with water, a metal chlorite and acid react to produce chlorine dioxide. A44, 2:16-31. The chlorine dioxide solution is available as a

deodorizer and anti-microbial solution. A44, 2:63-66. Traditionally, a dry mixture of acid and sodium chlorite is enclosed in a compartment formed by a membrane shell. A44, 2:56-60. When the deodorizer is placed in water, water penetrates the membrane shell and reacts with a metal chlorite and acid to produce chlorine dioxide gas. A44, 2:60-62. The membrane shell is permeable to gas, which allows the chlorine dioxide to exit the deodorizer. A44, 2:63-66.

Manufacturers of conventional deodorizers typically must choose between increased product shelf life and faster deodorizing action on contact with water. In order to improve shelf life, conventional deodorizers slow the absorption of water and prevent premature activation of the deodorizers by ambient moisture or water. A45, 3:3-7. These mechanisms, however, also slow the quick release of chlorine dioxide when needed. A45, 3:7-9.

J. Blair Girard invented improved deodorizers, embodied in the '661 patent, that avoid this design compromise. Odorstar Technology LLC owns the '661 patent. A366. Kinpak, Inc., is the exclusive manufacturer of a line of deodorizers sold under license to the '661 patent. A365-6. The '661 patent uses wicking material to control the rate at which water contacts and activates the acid and sodium chlorite. *E.g.*, A50, 13:56-63.

### C.     The Girard '661 Patent

#### 1.     The Specification Teaches That the Wick Member May, But Need Not, Extend Outside the Membrane Shell

In preferred embodiments, the wicking material extends outside the membrane shell. But the '661 patent explicitly teaches that the wick member **24** need not extend beyond the outer edge **40** of the membrane shell **22**:

> The wick member **24** can be connected to the membrane shell **22** by being directly or indirectly fastened to a portion of the shell or *by being merely inserted into the compartment 30*.

A46, 6:33-36 (emphasis added). The specification nowhere requires that the wick extend outside the shell. It is preferred but is not necessary. "Preferably at least 15% of the outer periphery of the wick member 24 extends beyond the outer periphery of the membrane shell 22." A46, 6:67-A47, 7:2. In fact, the specification contemplates reducing the surface area of the wick member **24** to slow down the absorption of water. A48, 9:23-25. The specification does not limit how much the surface area of the wick member **24** extending outside of the device can be decreased. In fact, the wick can be merely inserted into the compartment, in which case it will not extend outside the shell, or even be fixed to the compartment.

The '661 patent discloses at least nine preferred embodiments. Appellants concede that in each of the preferred embodiments, as well as in each of the Figures, the wick member **24** extends beyond the outer edge **40** of the membrane

shell **22**. In these configurations, the wick member **24** comes directly into contact with water outside the device.[3]



Figures 1-3 depict the first preferred embodiment. In it, a top end **62** of the wick member **24** extends beyond the outer edge **40** of the membrane shell **22**. A46, 6:61-66. In a second preferred embodiment, depicted in Figures 4-6, the entire outer periphery of the wick member **24** extends beyond the outer edge of the membrane shell **22** on all four sides. A49, 11:26-31. This second embodiment also includes two compartment sections **30A** and **30B**, instead of the single compartment **30**, depicted in Figure 3, for the first embodiment. A49, 12:48-13:26.

---

[3]     In Figure 1, element 74 is only a package for the device. A47, 7:20-27.

In addition, the membrane shell **22** may be permeable to water in this second embodiment. A47, 8:1-6, 8:54-61.

In a third preferred embodiment, depicted in Figure 7, wick member **24** is the same as in the second embodiment but membrane shell **22** has small openings **80** to allow liquid into and out of the compartment **30** defined by the membrane shell **22**. A49, 12:27-39. These second and third embodiments are particularly relevant with respect to the construction of "wick means" and "connected to." In these embodiments, the wick means can be merely inserted into the compartment **30** and still function to absorb and transport water into the compartment **30** as described in the specification. Namely, water can enter into the compartment **30** through the water-permeable shell **22**, A47, 8:1-6, *Id.*, 8:54-61, A49, 12:26-34, and be absorbed and transported farther into the compartment by the wick means "being merely inserted into the compartment." A46, 6:33-36.

A fourth preferred embodiment, depicted in Figures 8-9, divides the compartment **30** into four compartment sections, but it otherwise is the same as the second embodiment. A49, 12:40-64. A fifth preferred embodiment, depicted in Figure 10, divides the compartment **30** into three compartment sections. A49, 12:65-A50, 13:5.

A sixth preferred embodiment, depicted in Figures 11 and 12, uses two wick members, **24A** and **24B,** instead of one, but is otherwise the same as the second

preferred embodiment. A50, 13:6-22. A seventh preferred embodiment, depicted in

Figures 13-15, has two compartment sections, **30A** and **30B,** as in the second

preferred embodiment, and stores the acid and sodium chlorite reactants in separate

compartment sections. A50, 13:33-14:17.

In an eighth preferred embodiment, depicted in Figure 18, the shell **22** is not

sealed on all sides, and has an opening and adhesive strip to permit addition to the

pouch. A50-51, 14:18-25.

In a ninth embodiment, a reactant is stored in an ampule positioned inside a

compartment section. A50-51, 13:23-15:67. At the point of use, the user breaks the

ampule to release the reactant. *Id*. These features of the ninth embodiment are

depicted in Figures 13-23.

Nothing in these embodiments requires the wick member **24** to extend

beyond the outer edge **40** of the membrane shell **22**. Rather, the '661 patent

expressly discloses that the wick member **24** need not extend beyond the outer

edge **40** of the membrane shell **22** and can be fully contained within the

compartment. A46, 6:33-36.

### 2. The Specification Discloses a Structure In Which an Acid Component Is Wrapped In Wicking Material and Fully Enclosed Within the Membrane Shell

The '661 patent uses wicking material in at least two different

components—the wick member **24**, and an acid component **34** in certain

embodiments of the invention. "[T]he acid component **34** can be an acid powder wrapped in a material with ***wicking action***, preferably the same material used to form the wick member **24**." A50, 13:56-58 (emphasis added). This "wicking action," A50, 13:56-58, is the same function disclosed throughout the specification, namely, absorbing and transporting water into the compartment, *see, e.g.*, A48, 9:28-58 (discussing that the wick member **24** performs "wicking action"). Moreover, the structures performing this wicking action—in which these acid powder components are wrapped in wicking material—are fully contained within the compartment.

Figure 14 below depicts the acid component **34** fully enclosed within the membrane shell formed by membrane shell portions **22A** and **22B** (red highlighting).



**FIGURE 14**

In a preferred embodiment, the acid component **34** is transported in a separate package **98**. A50, 14:1-5. At the point of use, the user removes the acid component **34** from package **98** and adds it into a compartment section **30B**. A50, 14:1-11. The user then seals the compartment section **30B**. *Id*. Alternatively, the acid component **34** is initially sealed in a compartment section **30A**, and the metal chlorite is separately packaged for insertion into compartment section **30B** at the point of use. A50, 14:13-17. In either configuration, the wicking material wrapper

for acid component **34** provides the described wicking action of absorbing and

transporting water into the compartment.

### 3. The Specification Teaches a Mechanism for Wicking Action That Does Not Require the "Wick Means" to Directly Contact Water Outside the Device

Wicking materials disclosed in the '661 patent include synthetic fibers,

naturally occurring fibers (both modified and unmodified), or both. A48, 9:33-36.

The '661 patent provides a long list of exemplary wicking materials:

> Examples of suitable natural fibers for the wick member **24** include cotton, Esparto grass, bagasse, hemp, flax, silk, wool, wood pulp, chemically modified wood pulp, jute, rayon, ***ethyl cellulose, and cellulose acetate***. Suitable synthetic fibers can be made from polyvinyl chloride, polyvinyl fluoride, polytetrafluoroethylene, polyvinylidene chloride, polyacrylics such as Orlon®, polyvinyl acetate, polyethylvinyl acetate, non-soluble and soluble polyvinyl alcohols, polyolefins such as polyethylene and polypropylene, polyamides such as nylon, polyesters such as Dacron® and Kodel®, polyurethanes, polystyrenes and the like.

A48, 9:39-53 (emphasis added). The relevant structures in the accused products are

cellulose pellets. A16; A1148; A1153-5.

The wicking material draws water into the compartment through absorption

of water, capillary action, or other mechanisms. A48, 9:51-53. Capillary action

does not require the wicking material to extend outside of the membrane shell in

order to draw water into the compartment. A1227-9. Instead, water may be drawn

into the compartment through a water-permeable membrane shell as disclosed in

13

the second and third embodiments. A47, 8:1-6, *Id.*, 8:54-61, and A49, 12:26-34.

From this point, inside the compartment, water can be absorbed and transported

farther into the compartment by the wicking material.

The specification expressly discloses that the membrane shell may be made

of water-impermeable material with holes formed in it to make it permeable to

water. A49, 12:26-34. It can also be made of water-permeable membrane

materials:

> Suitable water-permeable materials include gelatin, polyvinyl
> alcohol, cellulose, and cellulose derivatives such as
> hydroxypropyl methyl cellulose. Other water-permeable and
> water-impermeable materials suitable for use in forming the
> membrane shell **22** (including the panels **22A** and **22B**) are
> known to those skilled in the art and are included within the
> scope of the present invention.

A47, 8:54-61. Thus, the '661 patent specification expressly discloses that the

membrane shell of the compartment may be water-permeable and, further, that the

wick means may be merely inserted into the compartment for "absorbing water and

transporting water into said compartment." A54, 21:47-48.

### D.    The Claims on Appeal

Odorstar asserted only claims 1, 3, and 8-12. Claim 1 is independent. The

disputed terms, "wick means" and "connected to," appear only in claim 1:

> 1.    A device for producing an aqueous chlorine
> dioxide solution when exposed to water comprising:

14

> a membrane shell defining a compartment which includes one or more dry chemical components capable of producing chlorine dioxide gas when exposed to water; and
>
> **_wick means connected to_** said membrane shell and extending into said compartment **_for absorbing water and transporting water into said compartment_** whereby when said device is exposed to water said wick means absorbs water and transports water into said compartment, said chemical component(s) dissolve in the water and produce chlorine dioxide gas in said compartment, and chlorine dioxide gas exits said compartment through said membrane shell.

A54, 21:40-54 (emphasis added). The United States Patent and Trademark Office granted the application that matured into the '661 patent on a first-action allowance. All claims, including claim 1, are part of the original specification and provide written description support for the asserted claims.

Appellants concede that "wick means" invokes 35 U.S.C. § 112, sixth paragraph, as it existed before the enactment of the Leahy-Smith America Invents Act. The "wick means" is for "absorbing water and transporting water into said compartment." A54, 21:47-48. Claim 1 does not specify where water is absorbed by the wick means, whether inside or outside the compartment. Nothing in claim 1 requires that the wick means absorb water at a point outside the compartment. The function of the wick means recited in claim 1 is broad enough to encompass wick means extending outside the compartment and absorbing water outside the compartment, as well as wick means being "merely inserted into the compartment"

and absorbing inside the compartment water that has already entered the compartment through a water-permeable membrane shell.

At least two structures that can absorb and transport water are disclosed in the specification—the wick member **24** and the wicking wrapper of the acid component **34**—for performing this wicking action of "absorbing water and transporting water into said compartment." A54, 27:47-48.

In the '661 patent, the wick member **24** can be connected to the membrane shell **22** in various ways. It can be fastened to the shell. It can also be "connected to" the membrane shell **22** "by being merely inserted into the compartment 30." A46, 6:33-36. Nothing more than mere insertion is required by claim 1.

### E.    The Accused "Shocker" Products

The accused Shocker Products[4] have a "wick means" that is "merely inserted into the compartment." The specification expressly provides that the wick means may be merely inserted into the compartment shell as they are in the accused Shocker product.

Odorstar acknowledges that the Shocker products do not use preferred embodiments of the '661 patent. The wicking member in the accused Shocker

---

[4]    "Shocker" products refers collectively to four accused products—Biocide's Room Shocker, RV Shocker, Marine Shocker, and Auto Shocker. A1145-6, ¶ 8. In terms of the infringement analysis, the accused products are equivalent. *Id*.

products are not identical to the wick member **24** of preferred embodiments of the '661 patent.

The Shocker products include a cardboard cup containing a water-permeable "tea bag" made of filter paper, depicted in the following picture:



A1148 (borders cropped). The tea bag has a chemical pouch made of water-soluble paper containing the chemicals used for creating chlorine dioxide when exposed to water. A1148, ¶ 13. The tea bag also contains absorbent dry briquettes of cellulose "pellets" or "squares." A1147, ¶ 12; A1148, ¶ 14; A1153-4, ¶ 10.

In preferred embodiments of the '661 patent, the wick member **24** extends beyond the outer edge of membrane shell **22.** In the Shocker products, in contrast, the cellulose pellets are "merely inserted into the compartment." A1154, ¶ 12.

Thus, while the wick member **24** in the preferred embodiments contacts water outside the compartment **30**, the cellulose pellets do not extend outside the tea bag compartment. A1155, ¶ 14. Whereas the wick member **24** is fastened to the membrane shell **22** in preferred embodiments by being sewn to the shell, the cellulose pellets are "merely inserted into the compartment" in the accused Shocker Products. A1154, ¶ 13.

None of these differences, however, are implicated by a proper construction of the asserted claims. Rather, each of these variations from the preferred embodiments is expressly disclosed in the specification.

### F.    Course of the Proceedings

On January 18, 2013, Odorstar filed a patent infringement action against SMM, accusing SSM's Shocker Products of infringing the '661 patent. A100-A106. Odorstar sought discovery, and SMM resisted. A1344. Odorstar moved to compel. *Id*. Three weeks later, SMM provided its documents, *id*. n.1, and both Odorstar and SMM moved for summary judgment, seeking construction of the terms "wick means" and "connected to." A764-A787; A1156-1174. The district court construed both terms, A9-A12, and, based on its construction, granted SMM's motion for summary judgment, A19. Odorstar appeals.

### G.    The District Court's Claim-Construction Ruling Diverges From the Specification In Critical Respects

Odorstar appeals the district court's claim construction and summary judgment of noninfringement. The district court's claim-construction ruling is critical to its judgment. A5. Absent modification of the district court's claim construction, Odorstar concedes that it cannot establish infringement.

The parties requested construction of six terms. A4. The Court determined that four of the terms—"membrane shell," "compartment," "extending into," and "transports"—should be given their common ordinary meanings and declined to further construe these four terms. A7-8; A12-13. The court construed only "wick means and "connected to." A9-12.

The parties agree that "wick means" is a means-plus-function limitation. A9. The district court correctly identified that the first step in construing a mean-plus-function limitation is to identify the claimed function. *In re Aoyama*, 656 F.3d 1293, 1296 (Fed. Cir. 2011); A9. The function of the wick means stated in claim 1 is: "for absorbing water and transporting water into said compartment" and that the "wick means absorbs water and transports water into said compartment." A54, 21:47-51. Claim 1 does not specify at which point the water is absorbed, whether inside or outside the compartment, only that water be absorbed and that water be transported into the compartment. The district court, nonetheless, adopted

Biocide's argument that the claimed function requires "absorbing water *from outside the device*." A9 (emphasis added).

For the corresponding structure, the district court looked not to the structures disclosed in the specification and their equivalents but, rather, took a more limited view:  "what structures are specifically disclosed and tied to that function in the specification." A10. Limiting its focus to only those structures "specifically disclosed," the district court failed to consider the full scope of the specification. The district court believed that "[t]he defining feature of the '661 Patent's invention is a wick that extends from outside of the membrane shell and into the compartment." A17. Armed with this narrow focus, the district court concluded, incorrectly, that "[t]he structures that are provided and depicted in the specification all identify a wick member that extends beyond the outermost edge of the shell, or, at the very least, is flush with the membrane shall but is nevertheless directly exposed to water on the outside of the shell." A11. Yet, this conclusion contradicts the express disclosure of the specification that "wick member **24** can be . . . merely inserted into the compartment **30**." A46, 6:33-36. Also, the specification discloses as the "wick means" a wrapping material for the acid component **34** that performs wicking action fully enclosed within the compartment. A50, 13:56-60.

Based on these considerations, the district court construed "wick means" to mean: "a wick member that extends beyond the outermost edge of the shell, or, at

the very least, is flush with the membrane shell but is nevertheless directly exposed to water on the outside of the shell." A11.

With respect to "connected to," the district court expressly noted that the specification provides: "The wick member **24** can be connected to the membrane shell **22** by being directly or indirectly fastened to a portion of the shell of by being merely inserted into the compartment **30**." A11. The district court acknowledged that "[t]ypically, the specification is the best guide for construing the claims."[5] A6. Yet, rather than construing the term "connected to" consistent with the specification,[6] the district court rejected this express disclosure of the specification and concluded that "nothing in the . . . specification indicates that a wick means can be 'within' the membrane." A11. The district court limited its construction of "connected to" as "requiring the 'wick means' to have some sort of link with the membrane shell." A11; A18. In so doing, the district court rejected the express disclosure of the specification that allows for the wick to be "merely inserted within" the compartment, *see* A12, in favor of the Court's own requirement that there must be some undefined physical link that goes beyond merely being in sufficient contact with the membrane to absorb and transport water, A11.

_____

[5]     *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*).

[6]     *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd,* 517 U.S. 370 (1996).

Odorstar respectfully submits that the district court erred and requests that this Court reverse the district court's claim construction, vacate its judgment, and determine the proper construction of the terms "wick means" and "connected to." Wick means is not limited to a wick that extends outside of the compartment. Rather, the wick means can be merely inserted into the compartment. Nor does "connected to" require fixation to the shell. As detailed in the specification, the wick means may be "merely inserted into the compartment." A46, 6:33-36. Odorstar respectfully requests that this Court remand this case to the district court for further proceedings consistent with the proper claim construction.

## IV.    SUMMARY OF THE ARGUMENT

The '661 patent discloses a compartment defined by a membrane shell. It expressly discloses that a "wick means" "connected to" a membrane shell for absorbing and transporting water into the compartment may be "merely inserted into the compartment." A46, 6:33-36. In this location, the water is absorbed inside the compartment and transported farther inside the compartment. Although not a preferred embodiment of the '661 patent, it is, nonetheless, a configuration expressly disclosed in the specification. In preferred embodiments, in contrast, the wick extends outside the shell. Odorstar respectfully submits that the district court erred in construing the claims as being limited to preferred embodiments of the

invention, in a manner that contradicts this express disclosure of the '661 patent specification.

First, with respect to the term "wick means," the district court misconstrued the claimed function. The specification discloses—as preferred embodiments—a wick means that extends outside the shell and functions to absorb water at this location, outside the compartment. The specification also discloses, alternatively, wick means "being merely inserted into the compartment" and absorbing water at this alternative location, inside the compartment. A46, 6:33-36. With respect to the location at which the "wick means" of claim 1 absorbs water, the function specified in claim 1 is merely "absorbing water." Claim 1 includes no further limitation about the location at which the "wick means" absorbs water, whether outside or inside the compartment. The district court erred by importing limitations from the preferred embodiments to limit the function of "wick means" to absorb water at a location outside the compartment.

Second, the district court also erred in limiting the structure of the "wick means" to only those preferred embodiments "specifically disclosed" in the specification. A10. Undeniably, the preferred embodiments include a wick that extends outside the shell. The specification, however, is broader and expressly discloses that the wick may be "merely inserted into the compartment." A46, 6:33-36. The specification also discloses an acid component **34** that performs the

wicking action fully enclosed within the compartment. A50, 13:56-60. Based on its belief that "[t]he defining feature of the '661 Patent's invention is a wick that extends from outside of the membrane shell and into the compartment," A17, the district court improperly limited the structure to this "defining feature" and these preferred embodiments.

Third, the district court erred in limiting "connected to" to some undefined physical link. In doing so, it ignores the express disclosure of the specification that "connected to" includes "being merely inserted into the compartment." A46, 6:33-36.

Two further reasons confirm that the district court erred in its claim construction: (1) the principle of claim differentiation; and (2) this Court's established framework for claim construction—that the claims are given their common ordinary meaning absent clear lexicography or clear and unmistakable disclaimer or disavowal. The first, claim differentiation, is not a rigid canon of construction but, rather, a guideline. *Nomos Corp. v. BrainLAB USA, Inc.*, 357 F.3d 1364, 1368 (Fed. Cir. 2004). Nonetheless, several of the dependent claims contain additional limitations that require the wick to extend outside the shell. Claims 1, 37, and 52 are the only independent claims. Claims 15, 42, and 55 are dependent upon them, respectively. Each adds the further limitation that the wick extends beyond the membrane shell. Including this further limitation within the

24

construction of "wick means" in independent claim 1, as does the district court, would render each of these dependent claims superfluous, contradicting the district court's construction.

Finally, the district court failed to follow this Court's established framework for claim construction. The terms used in a claim are given their common ordinary meanings, absent either: (1) clear lexicography; or (2) clear and unmistakable disavowal or disclaimer of claim scope. *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 734 (Fed. Cir. 2014). The common ordinary meaning of a term cannot be limited by mere implication but, rather, by clear lexicography, or clear and unmistakable disavowal or disclaimer. Neither doctrine applies on this record. Even assuming, *arguendo*, that the district court could somehow conclude that the common ordinary meaning of "connected to" requires some undefined physical link, the express statement at Col. 6, ll. 33-36, of the specification, that "connected to" means that the wick member may be "merely inserted into the compartment" refutes this assumption. It provides a clear definition that "connected to" is not limited in the manner construed by the district court.

For all of these reasons, the district court erred in limiting the function of the "wick means" to the functions of the preferred embodiments disclosed in the specification, the structure of the wick means to the structures of the preferred embodiments "specifically disclosed" in the specification, and the term "connected

25

to" some undefined physical link. These constructions improperly imported limitations from the preferred embodiments. They also violate principles of claim differentiation and this Court's established framework for claim construction. Odorstar respectfully requests that this Court reverse these constructions, vacate the district court's judgment, and remand the case to the district court for further proceedings consistent with an appropriate construction of the claims.

## V.    ARGUMENT

### A.    The Claim Construction Is Reviewed *De Novo*

The court construes the meaning and scope of the asserted claims. *Activevideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1318 (Fed. Cir. 2012). Claim construction is a question of law that is reviewed *de novo*. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1292 (Fed. Cir. 2014) (en banc).

### B.    The Legal Principles Governing Claim Construction Are Well-Established

When construing claims, a court must begin by "look[ing] to the words of the claims themselves . . . to define the scope of the patented invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007). The task of comprehending those words is not always difficult. "In some cases, the ordinary meaning of claim

26

language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Acumed*, 483 F.3d at 805 (quoting *Phillips*, 415 F.3d at 1314).

District courts are not required to construe every limitation in an asserted claim. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). When a term has more than one ordinary meaning, or when reliance on a claim term's ordinary meaning does not resolve a dispute regarding the scope of the asserted claim, the district court has a duty to resolve the dispute by determining the correct scope and meaning of the disputed term as a matter of law. *Id. at* 1362-3. Nonetheless, in some cases, such as this one, the ordinary meaning of certain terms may be readily apparent.

The general rule is that a term should be given its plain meaning. *See Uship Intellectual Props., LLC v. United States*, 714 F.3d 1311, 1313 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1313). "A ***heavy presumption*** [exists] that claim terms carry their full ordinary and customary meaning, unless it can [be] show[n that] the patentee expressly relinquished claim scope." *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (emphasis added). "A claim term should be given its ordinary meaning in the pertinent context, unless the patentee has made clear its adoption of a different definition or otherwise disclaimed that

27

meaning." *Ancora Techs.*, 744 F.3d at 734; *see also SkinMedica, Inc. v. Histogen, Inc.*, 727 F.3d 1187, 1195-96 (Fed. Cir. 2013). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Id.* (citing *Thorner v. Sony Computer Entm't Am., LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1373 (Fed. Cir. 2013). Neither applies here.

Lexicography permits a patent owner to deviate from the plain meaning and define a term. A court may review a patent's specification "to determine whether the inventor has used any terms in a manner *inconsistent* with their ordinary meaning." *Vitronics*, 90 F.3d at 1582 (emphasis added). A patent owner deviates from plain meaning only when it does so with "with reasonable clarity, deliberateness, and precision." *See Teleflex Inc. v. Ficosa N.A. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (quoting *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994)). "[T]he statement in the specification must have sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term." *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005).

Disclaimer or disavowal may result from the patent owner's statements in the specification or prosecution history. Disclaimer is found only when a patent owner's statements "manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex*, 299 F.3d at 1325; *see also Teva Pharms.*, 723 F.3d at 1373 (requiring "clear and unmistakable disclaimer of claim scope"). "[E]ven if a specification has only one embodiment, its claims will not be confined to that example 'unless the patentee has demonstrated a clear intention to limit the claim scope using words or expression of manifest exclusion or restriction.'" *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1301 (Fed. Cir. 2013)(citation omitted).

The court may refer to the specification to aid in its construction of disputed terms. *See Phillips*, 415 F.3d at 1315-17. Nonetheless, the Federal Circuit has strongly cautioned courts not to import limitations from the specification into the claims. *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013) ("While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." (citing *Phillips*, 415 F.3d at 1323). The Supreme Court recognized this proscription over a century ago: "if we once begin to include elements not mentioned in the claim, in order to limit such claim . . . , we should never know

29

where to stop." *See Phillips*, 415 F.3d at 1312 (quoting *McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895)).

### C. The District Court Misconstrued the Claimed Function of the "Wick Means"

In construing the term "wick means," the court must first identify the claimed function; then it must construe the structure performing this function as the structures disclosed in the specification and their equivalents. *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1367 (Fed. Cir. 2012). Only after the claimed function is properly construed is the corresponding structure identified. *Id.* "An error in identification of the function can improperly alter the identification of structure in the specification corresponding to that function." *Micro Chem., Inc. v. Great Plains  Chemical Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

"The court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations." *In re Aoyama*, 656 F.3d at 1296-97. Just as the district court is not permitted to import structural limitations from the preferred embodiments into the claims, so too it is not permitted to import functional limitations from the preferred embodiments into the claimed function. SMM sought a narrow construction of the claimed function of "wick means" in order to avoid infringement. A1163-5. It asked the district court to rely on preferred embodiments and to import limitations

30

from these preferred embodiments into the claims. *Id*. If adopted, the district court would have to find no infringement. And this is precisely what it did.

SMM contends that the function of the "wick means" is "absorbing water from ***outside*** the device and transporting the ***absorbed*** water into the compartment." A1164 (emphasis original). SMM relies on preferred embodiments disclosed in the '661 patent, *id*., and selectively ignores other portions of the specification. SMM justifies importing these limitations under the guise of Section 112, sixth paragraph, and by arguing that the purpose of the wick member generally is to "transport water into the compartment at a much faster rate than it allows water and/or solution to escape the device." A1164 (citing A46, 6:38-40). Yet these statements describe preferred embodiments of the invention. Similarly, the statements from the specification relied upon by the district court, A10, are either general statements about the invention that do not limit the invention in the manner construed or statements about preferred embodiments of the invention.

The district court cites six specific statements from the specification as supporting its narrow construction of the claimed function to transport water from outside to inside the shell. A10. The first statement, at Col. 3, ll. 30-34, describes the invention generally. It provides that the "[w]ick means are connected to the membrane shell and extend into the compartment for absorbing and transporting water into the compartment." A45, 3:30-39. The specification makes clear that the

31

outermost end of the wick means—the end "connected to the membrane shell"—may be "merely inserted into the compartment." A46, 6:33-39. No physical connection or link to the membrane shell of the compartment is required. *Id.* The outermost end of the wick means need merely be inserted into the shell in a manner that it can absorb water ***inside*** the compartment. *Id*. The inner end of the wick means extends into the compartment for absorbing and transporting water farther into the compartment. A45, 3:30-38. Thus, far from requiring that the wick means extend outside the shell and absorb water outside the shell, this first statement confirms that the wick may be disposed entirely within the compartment and need not extend outside the compartment. Consequently, the wick means is not required to perform the function of absorbing water from a location outside the shell.

Each of the other five references relied upon by the district court to limit the claimed function of the "wick means," A10, refers to a preferred embodiment of the invention. The citation to Col. 3, ll. 43-44, expressly refers to a preferred embodiment. A45. The reference to Col. 6, ll. 24-27, expressly refers to a first preferred embodiment of the invention. A46. The reference at Col. 9, ll. 29-32, refers to the same first preferred embodiment. A48. The reference at Col. 13, ll. 12-14, refers to a sixth preferred embodiment. A50. The reference at Col. 17, ll. 35-38, refers to a ninth preferred embodiment. A52. Thus, the reference to "the invention" does not limit the invention in the manner construed by the district court and each

of the other references relied upon by the district court expressly describes a preferred embodiment.

The primary defect in the district court's construction of the claimed function of "wick means" is that it fails to identify the function specified in claim 1, as distinct from functions of preferred embodiments of the invention. Ironically, SMM relies on *JWW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005). A1021. *JWW* holds that: "A court may not construe a means-plus-function limitation 'by adopting a function different from that explicitly recited in the claim.'" *JWW Enters.*, 424 F.3d at 1331 (quoting *Micro Chem.*, 194 F.3d at 1258). Yet, this is precisely what the district court has done. This Court has repeatedly rejected incorporating limitations into the claims based on statements in the specification about a particular purpose, advantage, or function of the claimed invention. *See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003) ("Advantages described in the body of the specification, if not included in the claims, are not per se limitations to the claimed invention." (citation omitted)).

"While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013)(citation omitted).

The claimed function of the "wick means" is "absorbing water and transporting water into said compartment." A54, 21:46-54 (claim 1). Only two functions are specified. First, water must be absorbed. Claim 1 contains no further limitation as to the location where the water is absorbed. It can be absorbed outside the shell in preferred embodiments in which the wick extends outside the shell. It can also be absorbed inside the shell in alternative embodiments in which the wick is merely inserted into the compartment.

Second, water must be transported "into the compartment." This second function does not require that the water being transported have been absorbed outside the compartment. Rather, it can be absorbed inside the compartment and be transported more deeply into the compartment. The claimed function is broad enough to cover absorbing water that was absorbed by the wick means either outside or inside the compartment.

It would have been an easy matter for the inventor to specify this further limitation; he did not. Had the claim instead recited either "absorbing water outside the compartment" or "transporting water absorbed outside the compartment into said compartment," the appropriate construction may well have been different. Claim 1 contains no such functional limitations. It was error for the district court to have imported these additional functional limitations from the preferred embodiments.

**D.    The District Court Misconstrued the Structure of the Wick Means Disclosed in the Specification That Performs This Absorbing and Transporting Function**

The district court improperly limited the structures corresponding to the claimed function to preferred embodiments of the invention. In doing so, the district court imported structural features from the preferred embodiments that are unnecessary to perform the claimed function.

Structure disclosed in the specification is corresponding structure if the specification or prosecution history clearly links or associates that structure to the function recited in the claim. *In re Aoyama*, 656 F.3d at 1297. "[U]nder § 112, every structure disclosed in the specification and its equivalents should be considered," not just preferred embodiments. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1377 (Fed. Cir. 2003); *see Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1368-69 (Fed. Cir. 2005). "[A] court may not import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function." *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1097 (Fed. Cir. 2008) (quoting *Wenger Mfg., Inc. v. Coating Mach Sys., Inc.*, 239 F.3d 1225,1233 (Fed. Cir. 2001)); *Acromed Corp. v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371, 1382 (Fed. Cir. 2002).

For example, in *Altiris*, the Federal Circuit construed the claim term, "means of booting [a] digital computer." 318 F.3d at 1375-77. The preferred embodiment

of the specification described a customized Master Boot Record ("MBR") that puts the computer through an "automation" boot sequence by loading and executing an "automation partition." *Id*. at 1366. The preferred embodiment required the custom MBR to be used as part of every boot sequence. *Id*. at 1366, 1377. The specification also described a normal MBR that loads and executes a normal operating partition. *Id*. at 1366. The Federal Circuit held that the structure corresponding to the claimed "means of booting said digital computer" need not include the customized MBR, because "the description of the preferred embodiment is not a sufficient reason for so limiting the claims." *Id*. at 1377. Instead, the Federal Circuit construed the corresponding structure to "include each of the following and its equivalents: the normal operating system on the computer, another automation operating system, a customized or a normal MBR, and communications software." *Id*.

In *Callicrate*, the preferred embodiment in the specification described a cutting tool with a "lever pivotally mounted on the body of the tool." 427 F.3d at 1367. The district court, in construing the claim term "cutting means," limited the corresponding structure to the preferred embodiment—a cutting device pivotally mounted on the tool. *Id*. at 1368. The specification, however, disclosed other embodiments for performing this cutting function. The specification indicated that "[a]ny device for cutting the band 82 may be used[,]" including a sliding razor

mounted within the housing or hand-held cutting tools such as scissors and hand-held razors. *Id*. at 1369. Because the district court's construction did not account for these additional embodiments, the Federal Circuit held that the district court's construction was erroneous. *Id*. at 1368-69.

In *Acromed*, the patent disclosed a plate for surgical implantation onto a patient's spinal column. 253 F.3d at 1374. The Federal Circuit construed the recited functions of a means-plus-function element as "blocking effluence and restricting transverse movement." *Id*. at 1382. The preferred embodiments disclosed a screw with a body portion "having a diameter D1 which is substantially equal to the crest diameter D2 of the threaded portion . . . and, thus, is larger than [the root diameter of the tap]." *Id*. The Federal Circuit declined to limit the structure corresponding to the means-plus-function element in this manner because limiting the body portion to a diameter at least as large as the crest diameter of the second externally threaded portion would "impermissibly import into the claim limitation specific dimensions of a preferred embodiment that are unnecessary to perform the claimed function of blocking effluence and restricting transverse movement." *Id*.

In contrast, in *Welker Bearing*, the Federal Circuit adopted a limiting construction for the means-plus-function limitation: "mechanism for moving said finger." 550 F.3d at 1095-97. In *Welker Bearing*, the specification unambiguously taught that the mechanism for moving fingers required a central post rotating in

37

response to an actuator's rectilinear movement. *Id*. at 1098. The specification did not suggest any other structure for moving the claimed fingers. *Id*. Therefore, the Federal Circuit limited the corresponding structure to include the rotating central post. *Id*. at 1098-99.

In this case, properly construed, the function of the "wick means" recited in claim 1 is to absorb water and transport water into the compartment. The water can be absorbed either inside or outside the compartment. The '661 patent discloses structures corresponding to the properly construed function that are fully enclosed within the membrane shell **22**, and thus not directly in contact with water outside the membrane shell **22**. These include disclosures in alternative, non-preferred embodiments of an acid component **34**, A50, 13:49-59, and the wick member **24** "being merely inserted into the compartment." A46, 6:33-36.

The '661 patent discloses, in an alternative embodiment, an acid component **34** that "can be an acid powder wrapped in a material with wicking action, preferably the same material used to form the wick member **24**." A50, 13:56-59. The '661 patent discloses cellulose wicking materials for the wick member **24**, and for the acid component **34**. A48, 9:39-53. Figure 15 depicts acid component **34** in the form of pellets, like the cellulose pellets in the accused Shocker Products. A16; A39; A1153-4, ¶¶ 10-13. These pellets are sealed within a compartment (**30A** or

38

**30B**) formed within the membrane shell **22**. A50, 14:5-17. Figure 14 shows that acid component **34** is in contact with the inner surface of membrane shell **22**. A38.

Originally filed claim 3, depending from claim 1, recites that the membrane shell **22** may be water-permeable. A54, 21:57-58. The specification discloses that water can enter the compartment through a permeable membrane shell. A47, 8:54-57.

Similarly, the '661 patent discloses that wick member **24** corresponds to the claimed function of "absorbing water and transporting water into said compartment." A54, 21:46-51. The specification expressly teaches reducing the surface area of the wick member **24** extending outside of the device so as to slow down the water absorption rate. A48, 9:23-25. The specification does not place any lower limit on the extent to which the surface area of the wick member **24** extends outside of the shell. Rather, because the specification contemplates that the membrane shell itself may be water-permeable, A47, 8:54-57, the wick member **24** need not extend outside the membrane shell **22** at all in order for water to enter into the compartment.

The '661 patent discloses acid component **34** and wick member **24** as structures linked to performing the function of "absorbing water and transporting water into said compartment," as recited in claim 1. *See* A50, 13:56-60 (discussing the acid component **34** wrapped in a material with "wicking action"); A48, 9:28-58

(discussing that the wick member **24** performs "wicking action"). In alternative embodiments, neither acid component **34** nor wick member **24** extends outside the shell or is "directly exposed to water on the outside of the shell." The district court's construction, requiring both of these structural limitations, is inconsistent with the specification and is erroneous. A10-11.

### E.    The District Court Erred In Construing "Connected To" in a Manner that Expressly Contradicts the Specification

The district court construes "connected to" to require some undefined physical link between the claimed "wick means" and "membrane shell." The district court specifically holds, contrary to the express disclosure of the specification, that this link must go beyond mere contact or insertion. A11; A18.

In doing so, the district court violates the cardinal rule that claim terms should be construed in a manner that is consistent with the patent's specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). The '661 patent expressly teaches that the wick means may be "connected to" the membrane shell **22** by "being merely inserted into the compartment **30**":

> The wick member **24** can be ***connected to*** the membrane shell 22 by being directly or indirectly fastened to a portion of the shell or ***by being merely inserted*** into the compartment **30**.

A46, 6:33-36 (emphasis added). The specification expressly discloses that the wick means for absorbing water and transporting water into the compartment may be

merely inserted into the compartment. As depicted in Figure 3, A33, wicking material merely inserted into the compartment results in contact between wick member **24** and membrane shell **22**, allowing wick means to draw water into compartment **30.** Water can enter compartment **30** through a water-permeable membrane shell **22**. A47, 8:54-57. Thus, wick member **24** merely inserted into the compartment, without any additional physical link between the wick and the shell, results in the wick member **24** contacting the membrane shell to absorb and transport water into the compartment.

The district court analogized that: "A finding that the pellets are 'connected to' the membrane shell would be comparable to saying that the lipstick in a handbag is 'connected to' the purse." A18. Contrary to the district court's statement, the specification supports precisely this structural arrangement. The district court fails to articulate any reason why the analogy to the lipstick-and-purse is inappropriate, nor does it provide any construction of "connected to," apart from what it concludes it is not. The common, ordinary meaning of "connected" refutes these additional limitations construed by the district court.

When two live electrical wires make contact, the wires can conduct electrical current even absent an additional physical link. The common ordinary meaning is that the wires are connected. Similarly, social media may connect people without any additional physical link between them. Further, a computer can

41

be connected to the internet wirelessly, without any additional physical link. Nothing more than contact or communication is required to be "connected" within the common ordinary meaning of the term.

As another example, modern athletic apparel is typically made of wicking material. An athletic shirt need only be in contact with the person wearing it to perform this wicking function to absorb and transport water (sweat). The shirt need not be—and is not—physically linked to the person wearing it. Nevertheless, when the person exercises and perspires, the shirt absorbs perspiration and transports it— wicking it away from the wearer's skin. No link beyond mere contact is required to perform this wicking action.

## F.    The District Court Erred by Importing Limitations from the Specification into the Claims

This Court has repeatedly held that details from the specification should not be imported into the claims. In *Phillips*, the invention was a modular, steel-shell panel for making vandalism-resistant walls. *Phillips*, 415 F.3d at 1309. Every "baffle" disclosed in the specification was at an angle other than 90 degrees. The defendant argued that the term "baffle" should be limited to this angled orientation. The district court agreed and a panel of this Court affirmed, concluding that the applicant had used the term "baffle" in a restrictive manner. The panel dissent, however, noted that "there is no reason to supplement the plain meaning of the

42

claim language with a limitation from the preferred embodiment." *Id.* at 1310. The *en banc* Court reversed.

In the *Callicrate* case, mentioned above, the Court was asked to resolve a similar situation in which preferred embodiments of the invention were limited to a specific configuration, yet, the claim did not include the limiting language. *Callicrate* involved methods and apparatuses for castrating large animals. *Id.* at 1363. The specification disclosed a preferred embodiment of the trigger mechanism including a lever pivotally mounted on the body of the tool. *Id.* at 1365. As does SMM in this case, the defendant asked the court to limit the claims to the preferred embodiment. *Id.* at 1367. And, as explained above, the Federal Circuit noted in *Callicrate* that the claim language is broader than this limiting construction.

The Court noted that "[all] claims are indeed to be construed in light of the specification, as in the *Phillips* case itself, the district court in this case improperly imported limitations from the specification into the claims, thereby restricting the claims to coverage of a single embodiment." *Id.* at 1368 (citing *Phillips*, 415 F.3d at 1312); *see also Eolas Techs. Inc. v. Microsoft Corp*., 399 F.3d 1325, 1337 (Fed. Cir. 2005) (commenting that it is improper to limit claims to the preferred embodiment).

Other Federal Circuit decisions compel the conclusion that the '661 patent claims cannot properly be limited to their preferred embodiments. *Teleflex*, 299 F.3d at 1327-28. Teleflex involved a clip for a shift cable. The patent in Teleflex disclosed a number of embodiments in which the clip has a single pair of legs. *Id.* at 1327. The district court relied on these multiple references to limit the claims. This Court disagreed and again "cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification." *Id.* at 1328. Although this error was harmless in *Teleflex*, it is dispositive here.

### G.    Principles of Claim Differentiation Confirm That the District Court Erred in its Construction

The presence of dependent claims adding a further limitation raises a presumption that the limitation is not present in the independent claim. *Acumed LLC v. Stryker Corp.*, 483 F.3d at 806 (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004); *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1234 (Fed. Cir. 2001); *Comark Commc'ns v. Harris Corp.*, 156 F.3d 1181, 1187 (Fed. Cir. 1998); *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987); *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003); *Ecolab Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1375-76 (Fed. Cir. 2002)).

Other claims of the '661 patent illustrate that claim 1 is not limited in the manner construed by the district court. Claim 15 is instructive in this regard and provides:

> 15.    The device of claim 1 wherein said wick means is a wick member having a first end which extends into said compartment and an opposing second end which extends beyond the outer edge of said membrane shell.

A54, 22:29-32. Claim 15 adds the further limitation that one end of the wick extends into the compartment and an opposite end extends outside the compartment. This confirms that the patent drafter was aware of the significance of the wick extending outside the shell. By imposing this additional limitation, claim 15 is limited relative to independent claim 1 from which it depends. By implication, the "wick means" of claim 1 is not so limited. Thus, the wick means of claim 1 may but need not extend outside the shell. Yet, this is precisely the limitation added by the district court.

Claim 1 specifies a "wick means" . . . "extending into said compartment," not a wick means that extends outside the compartment or that is fixed to the membrane shell. The specification discloses that the wick member may be "merely inserted into the compartment." A46 6:33-36. Thus, claim 1 includes neither a functional nor structural limitation that the wick means must extend outside the shell. Claim 15 requires a wick member that extends beyond the membrane shell; claim 1 does not. Because claim 15 adds a further limitation that the wick extends

outside the shell, consistent with the doctrine of claim differentiation, claim 1 may, but ***need not***, encompass a wick member extending beyond the shell.

Claim 3 contains a further limitation that the membrane shell of claim 1 is permeable to liquid and gas. A54, 21:57-58. Because claim 3 adds a further limitation to claim 1 from which it depends, claim 1 includes structure consistent with claim 3. A permeable shell would permit water to enter into the compartment where it would be absorbed by the wick and transported further into the compartment.

### H.    The District Court Failed to Follow This Court's Established Framework for Claim Construction

The terms used in a claim claims should be given their common ordinary meanings, absent the patentee acting as his own lexicographer giving the terms a clear definition, or the patentee making a clear and unmistakable disclaimer or disavowal of claim scope. *Ancora Techs.*, 744 F.3d at 734.

In *Laryngeal Mask Co. Ltd. v. Ambu A/S*, 618 F.3d 1367, 1372 (Fed. Cir. 2010), defendant argued that the specification defined, by implication, the term "backplate" to include a tube joint. Although the preferred embodiment included this feature, the Court held that the specification did not clearly evidence the patentee's intent to give "backplate" this unique meaning. Similarly, although the '661 patent discloses in preferred embodiments that "[t]he wick member 24 functions as a wick in that it rapidly absorbs water from outside the device and

46

transports the absorbed water into the compartment 30," A46, 6:25-28, the '661 specification does not "clearly indicate" that Girard intended to give "wick means" this unique meaning, different from its ordinary and customary meaning. *See Laryngeal Mask Co. Ltd.*, 618 F.3d at 1372.

In *E-Pass Technologies, Inc. v. 3Com Corp.*, 343 F.3d 1364, 1365 (Fed. Cir. 2003), the Court vacated the district court's grant of summary judgment of noninfringement based on an improperly narrow construction of "multi-function card." The issue in *E-Pass* was similar to this case—whether the term "card" should be given its plain and ordinary meaning, or instead be limited to a standard credit-card size based on statements in the specification. The district court limited it to a standard credit-card-sized card, relying on certain "Advantages of the Invention." *Id*. at 1369. The Federal Circuit rejected this construction. *Id*. at 1370. The district court improperly limited the scope of the term based on the "perceived purpose served by the invention." *Id*. The Federal Circuit clarified that:

> [t]he court's task is not to limit claim language to exclude particular devices [from the scope of the claims] because they do not serve a perceived "purpose" of the invention. Rather, ***the district court's function is to interpret claims according to their plain language unless the patentee has chosen to be his own lexicographer in the specification or has clearly disclaimed coverage during prosecution.*** An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them.

47

*Id*. (emphasis added) (footnote and citation omitted). The plain meaning was the correct construction.

Similarly, in *Golight Inc. v. Wal-Mart Stores, Inc*., 355 F.3d 1327, 1331 (Fed. Cir. 2004), this Court held that patentees "were not required to include within each of their claims all of these advantages or features described as significant or important in the written description." "If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims." *Id*. (quoting *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985)); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908-09 (Fed. Cir. 2004) ("The fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives.").

In its opinion, the district court expressly limited the function of the "wick means" to the function of preferred embodiments of the specification, citing the advantage they provide of rapidly absorbing water ***from outside the device*** and transporting the absorbed water into the compartment. A10. This is error. Nowhere does Odorstar act as its own lexicographer to limit the claims in this manner in the various passages cited by the district court. A9-11. None of the cited passages

48

limits the "invention" to the wick means absorbing water outside the shell. This is a feature of preferred embodiments. None of the cited passages exhibits the "clarity, deliberateness, and precision" required to specifically define the term "wick means." Quite the contrary. As set forth above, the specification expressly provides that the wick means may be contained entirely within the compartment. A46, 6:33-36. Odorstar never set forth a clear, deliberate, and precise definition of the function of the claimed "wick means" term that is inconsistent with or varies from its common, ordinary meaning.

If anything, the disclosure of the wick member "being merely inserted into the container" clearly defines that the claim is ***not limited*** to a wick means that extends outside the shell. A46, 6:33-39. Even if the district court considered the common, ordinary meaning of "connected to" to somehow be limited to a physical link or connection, the disclosure at A46, 6:33-36, that the wick member can be "merely inserted into" the compartment, constitutes a clear definition to the contrary. This evidences that the term should be construed broadly. *Ancora Techs*, 744 F.3d at 734. The district court erred in limiting "connected to" to some unidentified physical link.

Nor is there any issue on this appeal that patentee never disclaimed or disavowed any portion of the scope of the claims. The claims were allowed on a first-action allowance. None of the claims was ever rejected by the U.S. Patent and

Trademark Office. The patentee made no statements that could be construed as a

disavowal or disclaimer, let alone a clear and unmistakable one. *Trading Tech.*

*Int'l., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010).

## VI.    CONCLUSION

The terms "wick means" and "connected to" are not properly limited to the

functions described and illustrated in preferred embodiments of the invention. The

limitations imposed by the district court are not found in the asserted claims.

Rather, the district court erred by importing these limitations from the preferred

embodiments into the claims.

This was error for several reasons. First, the district court construes the

claimed function of the wick means narrowly based on his impression of the

"defining feature" of the '661 patent as a whole. In doing so, it fails to identify

properly the function of the wick means specified in claim 1. Second, the district

court construes the corresponding structure not as the structure disclosed in the

specification and its equivalents but, rather, as the structure "specifically disclosed'

in preferred embodiments. Third, it errs in limiting the term "connected to" to an

undefined physical link, in conflict with the express disclosure of the specification

that the wick member may be merely inserted into the compartment.

These errors led the district court improperly to import limitations from the

specification into the claims. In doing so, it contravened principles of claim

differentiation and acted contrary to this Court's well-established framework for construing the claims.

Odorstar respectfully requests that this Court reverse and vacate the district court's construction and remand the case to the district court for further proceedings consistent with a proper construction of the claims.

July 16, 2014                                    Respectfully submitted,

                                        /s/Patrick J. Coyne
                                        Patrick J. Coyne
                                        FINNEGAN, HENDERSON,
                                            FARABOW, GARRETT &
                                            DUNNER, LLP
                                        901 New York Avenue, N.W.
                                        Washington, D.C.  20001-4413
                                        (202) 408-4000

                                        *Attorney for Plaintiffs-Appellants*
                                        *Odorstar Technology LLC, and*
                                        *Kinpak, Inc.*

51

ADDENDUM

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 13-60136-CIV-MIDDLEBROOKS/BRANNON

ODORSTAR TECHNOLOGY, LLC and
KINPAK, INC.,

      Plaintiffs,

vs.

SMM DISTRIBUTORS, LLC d/b/a
BIOCIDE SYSTEMS and SMM
MANUFACTURING, INC.,

      Defendants.

_____/

### FINAL JUDGMENT

For the reasons set forth in the Court's Order granting Defendants' Motion for Summary Judgment, it is hereby

**ORDERED AND ADJUDGED** that Final Judgment be and is **ENTERED** in favor of Defendants SMM Distributors, LLC, d/b/a Biocide Systems, and SMM Manufacturing, Inc. and against Plaintiffs Odorstar Technology, LLC and Kinpak, Inc.

It is further hereby

**ORDERED AND ADJUDGED** that the Clerk of Court shall **CLOSE** this case.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 27 day of January, 2014.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record

Case 0:13-cv-60136-DMM   Document 91   Entered on FLSD Docket 01/28/2014   Page 1 of 18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-60136-CIV-MIDDLEBROOKS/BRANNON**

ODORSTAR TECHNOLOGY, LLC and
KINPAK, INC.,

       Plaintiffs,

vs.

SMM DISTRIBUTORS, LLC d/b/a
BIOCIDE SYSTEMS and SMM
MANUFACTURING, INC.,

       Defendants.

_____/

**ORDER**

THIS CAUSE comes before the Court upon the Parties' cross Motions for Summary Judgment (DEs 55, 60) and claim construction briefs (DEs 51, 62). The Court held oral arguments attended by both sides on January 24, 2014. I have reviewed the Motions, Responses, Replies, claim construction briefs, and record in this case, and, with the benefit of oral arguments, I am otherwise fully advised in the premises.

**I.    BACKGROUND**

This patent case involves the alleged infringement of U.S. Patent No. 6,764,661 (the "'661 Patent") against Defendants SMM Distributors, LLC d/b/a Biocide Systems ("Biocide") and SMM Manufacturing, Inc.[1] In short, the '661 Patent claims a "device for producing an aqueous chlorine dioxide solution when placed in water." Plaintiff Odorstar Technology, LLC ("Plaintiff") is a Florida-based limited liability company engaged in the management and

---

[1] The action originally included claims against two individual defendants; however, the Court previously dismissed those defendants for lack of personal jurisdiction. (*See* DE 52).

1

treatment of odors and is the sole owner by assignment of the '661 Patent. Plaintiff Kinpak, Inc. ("Kinpak") is an Alabama corporation and the exclusive manufacturer for a line of deodorizing products sold under a license from the '661 Patent. One product Kinpak manufactures is a deodorizing product called "NOSGUARD," which deodorizes "by releasing a safe chlorine dioxide gas from a pouch containing dry material that releases gas when exposed to water." (DE 79 at 3-4).

The Complaint alleges that Biocide uses, sells, and offers to sell several odor-eliminating products called the "Room Shocker," "RV Shocker," "Marine Shocker," and "Auto Shocker" (collectively, the "Shocker Products"). Plaintiffs allege that Biocide has sold these products at least since January 2008, through the online marketplace, Amazon.com. It is these products that Plaintiffs allege infringe the '661 Patent. (*See* DE 79 at ¶ 28).

The Complaint[2] alleges that Biocide directly infringes one or more claims of the '661 Patent in violation of 35 U.S.C. § 271(a), with knowledge of the '661 Patent since at least as early as 2010. (DE 79 at ¶ 32). Specifically, Plaintiffs are asserting Claims 1, 3, and 8-12 of the '661 Patent.

**Claim 1**, the only independent claim, reads as follows:

1. A device for producing an aqueous chlorine dioxide solution when exposed to water comprising:

a membrane shell defining a compartment which includes one or more dry chemical components capable of producing chlorine dioxide gas when exposed to water; and

wick means connected to said membrane shell and extending into said compartment for absorbing water and transporting water into said compartment whereby when said device is exposed to water said wick means absorbs water and transports water into said compartment, said chemical component(s) dissolve in the water and produce

---

[2] The operative complaint is Plaintiffs' Second Amended Complaint (DE 79), filed on November 26, 2013.

chlorine dioxide gas in said compartment, and chlorine dioxide gas exits said compartment through said membrane shell.

(DE 60-1, col. 21, ll. 40-54).

**Claim 3** reads: "The device of claim 1 wherein said membrane shell is substantially impervious to liquid and permeable to gas." (*Id.*, col. 21, ll. 55-56).

**Claim 8** reads: "The device of claim 1 wherein said compartment includes a metal chlorite component and an acid component whereby when water is transported into said compartment metal chlorite and acid in said compartment dissolve in the water and react to produce chlorine dioxide in said compartment." (*Id.*, col. 22, ll. 3-8).

**Claim 9** reads: "The device of claim 8 wherein said metal chlorite component comprises a metal chlorite selected from the group consisting of alkali metal chlorites and alkaline earth metal chlorites." (*Id.*, col. 22, ll. 9-12).

**Claim 10** reads: "The device of claim 9 wherein said metal chlorite component comprises a metal chlorite selected from a group consisting of sodium chlorite, potassium chlorite, barium chlorite, calcium chlorite and magnesium chlorite." (*Id.*, col. 22, ll. 13-16).

**Claim 11** reads: "The device of claim 10 wherein said metal chlorite component is sodium chlorite." (*Id.*, col. 22, ll. 17-18).

**Claim 12** reads: "The device of claim 8 wherein said acid component comprises an acid selected from the group consisting of citric acid, lactic acid, tartaric acid, maleic acid, malic acid, glutaric acid, adipic acid, acidic acid, sulfamic acid, formic acid, sulfuric acid, hydrochloric acid and phosphoric acid." (*Id.*, col. 22, ll. 19-23).

There are six claim terms to be construed: (1) "membrane shell"; (2) "compartment"; (3) "wick means"; (4) "connected to"; (5) "extending into"; and (6) "transports." Each of these disputed claim terms are found in Claim 1.

3

In their Motions, the Parties seek summary judgment on the issue of whether the accused products infringe the '661 Patent. The Parties agree that there are no genuine issues of material facts in this case, that this case necessarily turns on the Court's construction of the claim terms, and that this case is therefore best resolved by the Court. Thus, once the disputed claim terms are properly construed by the Court, without reference to the accused products, this case is ripe for adjudication on the Motions for Summary Judgment.

## II.    CLAIM CONSTRUCTION

### A.    Legal Standard

Claim construction is a question of law to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "All intrinsic evidence is not equal however." *Id.*

Within the "intrinsic evidence," we first look to the words of the claims. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002); *Vitronics Corp.*, 90 F.3d at 1582. The words of the claims are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1313 (Fed. Cir. 2005) (en banc); *accord InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004); *Vitronics,*

4

90 F.3d at 1582. The ordinary and customary meaning of a claim term may be determined solely by viewing the term within the context of the claim's overall language. *See Phillips*, 415 F.3d at 1314 ("[T]he use of a term within the claim provides a firm basis for construing the term."). Moreover, the use of the term in other claims may provide guidance regarding its proper construction. *Id.* ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."). Claims should be construed "without reference to the accused device [or product]." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (emphasis omitted).

A claim should also be construed in a manner that is consistent with the patent's specification. *See Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part."). Typically, the specification is the best guide for construing the claims. *See Phillips*, 415 F.3d at 1315; *Vitronics*, 90 F.3d at 1582 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). Precedent forbids, however, a construction of claim terms that imposes limitations not found in the claims or supported by an unambiguous restriction in the specification or prosecution history. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *SRI Int'l*, 775 F.2d at 1121.

District courts may also consider "extrinsic evidence," such as dictionaries or technical treatises, to help understand the underlying technology and the manner in which one skilled in the art might use claim terms. *Phillips*, 415 F.3d at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's

definition is entirely unhelpful to a court. *Id.* Ultimately, however, "extrinsic evidence" is "less significant than the intrinsic record in determining the legally operative meaning of claim language," *id.* at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)) (internal quotations omitted), and a court should discount any extrinsic evidence "that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Id.* at 1318 (quoting *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)) (internal quotations omitted).

Once the proper meaning of a term used in a claim has been determined, the term must have the same meaning for all claims in which it appears. *Id.* at 1314 (citations omitted); *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002).

Keeping these legal standards in mind, the Court turns to the disputed claim terms.

B.    "Membrane Shell"

The first term to be construed is "membrane shell," which appears throughout the '661 Patent's claims and specification. Plaintiffs' proposed construction is "a thin sheet of enveloping material." Biocide's position is that the term does not require construction beyond its plain and ordinary meaning.

In support of Plaintiffs' proposed construction, Plaintiffs cite to the specification, the dictionary,[3] and their expert, Dr. DeFilippi.[4]

---

[3] In defining "membrane," Plaintiffs cite to the "British & World English" version of the Oxford Dictionary. (*See* DE 51-1 at 10 & n.2). Plaintiffs' cited definition for membrane ("a thin pliable sheet of material forming a barrier or lining") was not included in the "US English" version of the Oxford Dictionary, which was cited for all other definitions in Plaintiffs' brief.

[4] The Court notes that Plaintiffs misrepresent Dr. DeFilippi's construction. Plaintiffs purport that

6

In Claim 1, the device is comprised of "a membrane shell defining a compartment which includes one or more dry chemical components . . . ." When read in context, "membrane shell" does not need to be construed, as the term is readily understood. Plaintiffs' proposed construction additionally seeks to inject a limitation ("enveloping") to the term, which would render "defining a compartment" superfluous.

C.     "Compartment"

Next, Plaintiffs propose the Court construe "compartment" to mean "an area in which something can be considered in isolation from other things," whereas Biocide does not believe that this term requires construction beyond its plain and ordinary meaning. In support of their position, Plaintiffs rely only on the dictionary.

The Court is not persuaded that this term requires any construction. Plaintiffs' proposed definition is but one of three Oxford Dictionary definitions that might be applicable, and Plaintiff has provided no reason why its chosen definition is any better than the others. Moreover, Plaintiff has not made an adequate showing that imposing a dictionary definition would be helpful or necessary to understand the term.

Accordingly, the Court declines to construe "compartment" beyond its plain and ordinary meaning.

---

Dr. DeFillipi concludes that "membrane shell" should be construed as:
> a sheet or layer that is constructed or oriented such that the membrane makes up the shell or wall(s) of a compartment or chamber, that is, thin sheets or layers that act or function as walls, formed in the shape of an envelope, to create an enclosed space, a compartment.

(DE 51-1 at 11). However, a close review of Dr. DeFilipi's expert report demonstrates that Dr. DeFillipi was not proposing a construction for "membrane shell," but rather for "a membrane shell defining a compartment." (*See* DE 51-3 at ¶ 20). This distinction is important because Plaintiffs are asking the Court to construe "membrane shell" as a "thin sheet of *enveloping* material." Additionally, Plaintiffs' expert admits that "the '661 Patent does not contravene" his proposed interpretation. (*Id.*).

7

D.    "Wick Means"

The next term to be construed is "wick means." The Parties agree that this term qualifies as a "means-plus-function," which places it under the purview of 35 U.S.C. § 112, ¶ 6. Section 112, ¶ 6 provides that a patent applicant may express an element of a claim "as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *Id.* Thus, "[i]n exchange for the ability to use a generic means expression for a claim limitation, 'the applicant must indicate in the specification what structure constitutes the means.'" *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363 (Fed. Cir. 2012) (quoting *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 (Fed. Cir. 2007)).

Construing a means-plus-function limitation is a two-step process. First, the Court must identify the particular claimed function using traditional tools of claim construction. *Med. Instrumentation & Diagnositcs Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003) (citations omitted); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1330 (Fed. Cir. 2003). Second, the Court must "look to the specification and identify the corresponding structure for that function." *Elekta AB*, 344 F.3d at 1210 (citations omitted).

As to the first part of the analysis, Plaintiffs suggest that the function of "wick means" is wicking – *i.e.*, absorbing water. Biocide asserts that the function claimed is not merely wicking, but rather absorbing water from outside the device and transporting that water into the device's compartment.

The Court finds that Biocide's proposed function properly reflects that which is in the specification. The specification states multiple times that the wick's function is not only to

8

absorb water, but also to transport the absorbed water into the compartment. *See, e.g.*, '661 Patent, col. 3, ll. 30-34 ("Wick means are connected to the membrane shell and extend into the compartment for absorbing water and transporting water into the compartment whereby when the device is exposed to water the wick member absorbs water and transports water into the compartment . . . ."); col. 3, ll. 43-44 ("In a preferred embodiment . . . [t]he wick means quickly absorbs water and transports the water into the compartment."); col. 6, ll. 24-27 ("The wick member functions as a wick in that it rapidly absorbs water from *outside* the device and transports the absorbed water into the compartment.") (emphasis added); col 9., ll. 29-32 ("in the preferred embodiment, the wick member can be made of virtually any material capable of quickly absorbing water and transporting the absorbed water into the device"); col. 13, ll. 12-14 ("The use of two wick members [] increases the wicking ability of the device [] resulting in faster absorption and transport of water into the compartment [].."); col. 17, ll. 35-38 ("The wick member (or members) carries out many important functions.  First, it absorbs water and transports the water into the compartment(s) in the device in a controlled manner.").  Perhaps the most instructive language, however, comes from Claim 1 itself, which provides: "wick means connected to said membrane shell and extending into said compartment for absorbing water and transporting water into said compartment."  Thus, the Court concludes that the function of the "wick means" is to absorb water from outside the device and transport that water into the interior of the compartment.

As to the corresponding structure for this function, "[u]nder § 112, ¶ 6, the question is not what structures a person of ordinary skill in the art would know are capable of performing a given function, but what structures are specifically disclosed and tied to that function in the specification." *Saffran v. Johnson & Johnson*, 712 F.3d 549, 563 (Fed. Cir. 2013).  The

9

structures that are provided and depicted in the specification all identify a wick member that extends beyond the outermost edge of the shell, or, at the very least, is flush with the membrane shell but is nevertheless directly exposed to water on the outside of the shell.

     E.     <u>"Connected to"</u>

Next is the term "connected to." Plaintiffs propose "bring together or into contact so that a real or notional link is established; or merely inserted within." Biocide proposes "united, joined, or linked."

Plaintiffs cite to the dictionary definition of "connected to" as "bring together or into contact so that a real or notional link is established." For the "or merely inserted within" part of their construction, Plaintiffs cite to the specification, which provides: "The wick member 24 can be connected to the membrane shell 22 by being directly or indirectly fastened to a portion of the shell or by being merely inserted into the compartment 30." Plaintiffs also cite to Dr. DeFillipi for their admittedly "expanded definition" of "connected to." (DE 51-1 at 15). However, nothing in the sentence cited by Plaintiffs or the specification indicates that a wick means can be "within" the membrane. It is thus unclear how Dr. DeFillipi arrives at his position that the wick means "may be merely inserted into the compartment, such as a sponge fragment placed in an envelope." (DE 51-3 at ¶ 27). It is similarly curious how this hypothetical sponge fragment would be "connected to" this envelope, if only placed in inside.

The Court is not persuaded by either side that "connected to" requires construction beyond the plain and ordinary meaning of the term. In context, the Court reads "connected to" as requiring the "wick means" to have some sort of link with the membrane shell. While the specification provides several embodiments for this connection, the Court does not see the need

to read these embodiments into the claims, as both Parties suggest.[5]  Additionally, the Court does not find merit to the position that the term "connected to" allows for the wick to be "merely inserted within."  The term "within" does not appear in the '661 Patent, and the Court declines to broaden the list of possible connections to a breadth not necessarily claimed by the Patent.

       F.      "Extending into"

The next term is "extending into."  Plaintiffs propose "occupy a specified area," whereas Biocide proposes "to stretch, draw, or arrange in a given direction, or so as to reach a particular point, as a cord, wall, or line of troops."  Plaintiffs arrive at their construction by citing to a dictionary definition; however, Biocide's brief is unclear as to what source it relies on for its construction.

As above, "extending into" should be given its plain and ordinary meaning.  It should also be read in the context in which it appears: "wick means connected to said membrane shell and extending into said compartment for absorbing water and transporting water into said compartment . . . ."  The specification and claims themselves describe each and every embodiment of the '661 Patent as containing a wick with one end that extends out of (or is flush with) the membrane shell and another end "extending into" or sticking into the compartment through the membrane shell.  Plaintiffs' proposed construction would overly broaden the term in a manner not considered by the '661 Patent.

       G.      "Transports"

The final term to construe is "transports."  Plaintiffs propose "take or carry something from one place to another."  Biocide proposes "to carry, move, or convey from one place to

---

[5] At oral arguments, Biocide suggested that the "connection" requires the wick means to be held in place, as the specification's proposed embodiments all describe a wick that is held in place. Biocide noted that the invention would not be feasible if the wick were moving around and/or falling out of the membrane shell.

another." The Court does not see any distinction between the two constructions, and the Court will follow the plain and ordinary meaning of the term.

## III.    SUMMARY JUDGMENT

### A.   Summary Judgment Standard

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In making its assessment of summary judgment, the Court "must view all the evidence and [reasonably draw] all factual inferences . . . from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997). Additionally, the Court "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555, 1558 (11th Cir. 1990).

"By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

12

A013

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

B. Infringement

a. *Literal Infringement*

"To prove literal infringement, a plaintiff must show that the accused device contains each and every limitation of the asserted claims." *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1358 (Fed. Cir. 2012) (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011)). This may be done with direct or circumstantial evidence, and a patentee need not present direct evidence of infringement. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 449 F. App'x 923, 928 (Fed. Cir. 2011) (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009); *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1293 (Fed. Cir. 2008)). Further, it is improper to compare the accused product with a preferred embodiment in the Examples of the patent, instead of with the claims. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985)

13

(citations omitted). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Id.* (quoting *Bayer AG*, 212 F.3d at 1247).

> b. *The Doctrine of Equivalents*

An accused product that does not literally infringe a claim may still infringe under the doctrine of equivalents if each limitation of the claim is met in the accused product either literally or equivalently. *Cyber Corp.*, 138 F.3d at 1459 (citations omitted). "The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733 (2002).

To find infringement under the doctrine of equivalents, there must be "a showing that the difference between the claimed invention and the accused product was insubstantial." *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009) (citation omitted). A plaintiff may do so "by showing on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product." *Id.* (citing *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39-40 (1997)). Indeed, infringement may exist under this doctrine where similar chemicals are used to achieve similar results. *See Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1579-80 (Fed. Cir. 1984); *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 631 F. Supp. 2d 1010, 1041 (N.D. Ill. 2009); *Glaxo Wellcome, Inc. v. Pharmadyne Corp.*, 32 F. Supp. 2d 265, 291 (D. Md. 1998) ("The use of chemical substitutes for patented ingredients that are from the same family of chemicals may constitute infringement under the doctrine of equivalents.").

C. Discussion

After considering the arguments by both sides and the evidence presented, in conjunction with the Court's claim term constructions, the Court finds that Biocide is entitled to summary judgment in its favor, as the accused product does not infringe – either directly or by the doctrine of equivalents – the '661 Patent's claims.

The accused product contains a "tea bag" or "pouch" that is permeable to water and chlorine dioxide gas. There are no apparent openings or holes in this tea bag. The tea bag contains compressed cellulose "sponges" or "pellets"[6] that are wholly and loosely encased within the pouch. When water is poured over the pouch, it penetrates the pouch's lining, comes into contact with chlorine dioxide crystals in the pouch, and creates a chlorine dioxide gas that emanates through the pouch's lining and into the atmosphere to extinguish odors. When the water enters the pouch, it is absorbed by the cellulose pellets in a sponge-like manner. According to Biocide, this absorption serves the function of deterring spillage of potentially harmful or destructive liquids that are created.[7]

a. Literal Infringement

The accused Shocker Products do not literally infringe the '661 Patent. First, Biocide's products do not have a "wick means" as required by Claim 1. In order to find literal infringement of a means-plus-function claim limitation, the relevant structure in the accused device must perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification. *Applied Med. Resources Corp. v. U.S. Surgical*

---

[6] Plaintiffs prefer "sponge" whereas Biocide uses "pellet" to describe the cellulose blocks in Biocide's product.
[7] Biocide's products are used in boats, cars, and living quarters. Absorbing the liquid is important because the liquids in the Shocker Products could otherwise spill, and potentially stain or damage certain surfaces, for example, a car's interior.

15

*Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006) (citing *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1320 (Fed. Cir. 2003)). "Once the relevant structure in the accused device has been identified, a party may prove it is equivalent to the disclosed structure by showing that the two perform the identical function in substantially the same way, with substantially the same result." *Id.* (citing *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000)).

As noted above, the function of the wick means is to absorb water from outside the device and transport that water into the interior of the compartment. Here, the relevant structure in Biocide's products are the cellulose pellets. Plaintiffs admit that the pellets "absorb water from the inside of the permeable tea bag pouch." (Statement of Material Facts, ¶ 12). Thus, the function of the wick means in the '661 Patent and the cellulose pellets are not identical for purposes of infringement because the pellets do not absorb water *outside* of the shell and transport the water *into* the shell. When the pellets absorb water, the water has already penetrated the membrane shell. The pellets therefore do not transport the water from the outside to the inside – or take the water from one place to another. Thus, a finding of infringement is precluded on this ground alone. An additional function of the pellets is to absorb water so that liquids do not spill out of the accused device. This additional function is not considered in the '661 Patent.

Notwithstanding the differing functions, Biocide's product still does not infringe. The defining feature of the '661 Patent's invention is a wick that extends from outside of the membrane shell and into the compartment. Biocide's product does not contain this sort of structure, as its membrane shell is fully enclosed and does not have any sort of wick that extends out of the compartment and through the membrane shell.

16

Additionally, these cellulose pellets are not "connected to" the membrane shell in Biocide's products. It is true that the pellets may come into contact with the tea bag's lining; however, it cannot be said that the pellets are "connected to" the membrane shell under the plain and ordinary meaning of the term. A finding that the pellets are "connected to" the membrane shell would be comparable to saying that the lipstick in a handbag is "connected to" the purse. Thus, the accused product does not have wick means that are "connected to" the membrane shell.

Nor are the cellulose pellets "extending into" the compartment. The pellets are completely encased within the compartment, and there is nothing to indicate that they are "extending into" or sticking into the compartment as required by Claim 1. For this additional reason, the accused products do not infringe.

For these reasons, there is no literal infringement.

*b. Doctrine of Equivalents*

The Court similarly finds that there is no infringement under the doctrine of equivalents. As discussed above, the function of the wick means in the '661 Patent and the cellulose pellets in the accused products are markedly different. Thus, for this reason alone, there is no infringement under the doctrine of equivalents. Additionally, Plaintiffs have failed to show that each claim limitation is substantially met in the accused products. For example, the accused product's cellulose sponges are completely within the tea bag and do not transport water from outside the tea bag to inside the tea bag.

## IV.   CONCLUSION

For the foregoing reasons, summary judgment is due to be entered in favor of Defendants and against Plaintiffs. Judgment shall be entered by separate order. Further, the Court notes that

17

because Defendants do not infringe, the Court need not consider the Parties' ancillary arguments as to damages.

Accordingly, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Motion for Summary Judgment (DE 55) is **DENIED**;

2. Defendants' Motion for Summary Judgment (DE 57) is **DENIED** as moot; and

3. Defendants' Corrected Motion for Summary Judgment (DE 60) is **GRANTED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this *27* day of January, 2014.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record

18



US006764661B1

(12) **United States Patent**
Girard

(10) Patent No.: **US 6,764,661 B1**
(45) Date of Patent: **Jul. 20, 2004**

(54) **DEVICE FOR PRODUCING AN AQUEOUS CHLORINE DIOXIDE SOLUTION**

(75) Inventor: **J. Blair Girard**, Newcastle, OK (US)

(73) Assignee: **Avantec Technologies, Inc.**, Columbus, OH (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 693 days.

(21) Appl. No.: **09/605,689**

(22) Filed: **Jun. 27, 2000**

(51) Int. Cl.⁷ ............................ A61L 9/015; C01B 11/24
(52) U.S. Cl. ............................ 422/305; 422/120; 223/3; 252/187.21; 423/477
(58) Field of Search ................................. 422/120, 122, 422/305; 223/3; 426/408, 561; 99/467, 474, 485; 423/477; 252/187.21

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,022,262 A | 11/1935 | White | 87/5 |
| 2,071,091 A | 2/1937 | Taylor | 167/17 |
| 2,071,094 A | 2/1937 | Vincent | 167/17 |
| 2,482,891 A | 9/1949 | Jerman | 252/187 |
| 3,591,515 A | 7/1971 | Lovely | 252/187 |
| 4,104,190 A | 8/1978 | Hartshorn | 252/187 |
| 4,200,610 A | 4/1980 | Swaine et al. | |
| 4,547,381 A | 10/1985 | Mason et al. | 426/316 |
| 4,585,482 A | 4/1986 | Tice et al. | 106/15.05 |
| 4,593,040 A | 6/1986 | Adam et al. | 514/395 |
| 4,689,169 A | 8/1987 | Mason et al. | 252/186.24 |
| 4,731,193 A | 3/1988 | Mason et al. | 252/95 |
| 4,975,277 A | 12/1990 | Janisiewicz et al. | 424/93 |
| 5,008,096 A | 4/1991 | Ringo | 423/477 |
| 5,091,107 A | 2/1992 | Hutchings | |
| 5,215,747 A | 6/1993 | Hairston et al. | 424/93 |
| 5,278,112 A | 1/1994 | Klatte | 502/62 |
| 5,314,852 A | 5/1994 | Klatte | 502/60 |
| 5,334,619 A | 8/1994 | Vaughn et al. | 514/675 |
| 5,387,207 A | 2/1995 | Dyer et al. | 604/369 |
| 5,567,405 A | 10/1996 | Klatte et al. | 423/477 |
| 5,703,948 A | 12/1997 | Yanovsky | 380/21 |
| 5,705,092 A | 1/1998 | Wellinghoff et al. | 252/187.21 |
| 5,707,546 A | 1/1998 | Pitochelli | 252/187.21 |
| 5,707,739 A | 1/1998 | Wellinghoff et al. | 428/403 |
| 5,777,850 A | 7/1998 | Jakob et al. | 361/736 |
| 5,851,374 A | 12/1998 | Cowley et al. | 205/471 |
| 5,853,689 A | 12/1998 | Klatte | 423/478 |
| 5,885,543 A | 3/1999 | Klatte | 423/477 |
| 5,895,638 A | 4/1999 | Tenney | 423/478 |
| 6,015,935 A | 1/2000 | LaVon et al. | 604/378 |
| 6,238,643 B1 | 5/2001 | Thangaraj et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 959238 | 12/1974 |
| EP | 0 360 794 B1 | 8/1994 |
| WO | WO 99/24356 | 5/1999 |

*Primary Examiner*—Robert J. Warden, Sr.
*Assistant Examiner*—Sean E. Conley
(74) *Attorney, Agent, or Firm*—Speckman Law Group

(57) **ABSTRACT**

A device for producing an aqueous chlorine dioxide solution when placed in water. The device includes a membrane shell that defines a compartment which includes one or more dry chemicals (e.g., a metal chlorite and an acid) capable of producing chlorine dioxide gas when exposed to water. Wick means extend into the compartment for absorbing water and transporting water into the compartment such that the chemical(s) in the compartment dissolve in the water and produce chlorine dioxide. In one embodiment, the membrane is formed of a material that allows the passage of gas (e.g., chlorine dioxide) but is impervious to liquid (e.g., water). In another embodiment, the wick means is a wick member which divides the compartment into first and second compartment sections. One chemical (metal chlorite, for example) is contained within the first compartment section and another chemical (acid, for example) is contained within or can easily be placed in the second compartment section. When the device is placed in water, water enters the device by way of the wick means and possibly the membrane shell. The chemicals dissolve in the water and react to produce chlorine dioxide gas. The chlorine dioxide gas then passes through the membrane shell and possibly the wick member into the surrounding water transforming the water into an aqueous chlorine dioxide solution. The solution can then be used, for example, as a disinfectant solution.

**57 Claims, 12 Drawing Sheets**





FIGURE 1

FIGURE 2



FIGURE 4



FIGURE 3



FIGURE 6

FIGURE 5



FIGURE 8

FIGURE 7



FIGURE 9                    FIGURE 10



FIGURE 12

FIGURE 11



FIGURE 14



FIGURE 13



FIGURE 15

FIGURE 17

FIGURE 16



FIGURE 18                    FIGURE 19



FIGURE 21

FIGURE 20





**FIGURE 24**

**1**

## DEVICE FOR PRODUCING AN AQUEOUS CHLORINE DIOXIDE SOLUTION

### BACKGROUND OF THE INVENTION

This invention relates generally to apparatus and methods for producing aqueous chlorine dioxide solutions, and particularly to such apparatus and methods that utilize dry chemicals that react to form chlorine dioxide when exposed to water.

Chlorine dioxide is an excellent disinfectant and oxidizer with bleaching, deodorizing, bactericidal, viricidal, algicidal and fungicidal properties. It is frequently used to control microorganisms on or around foods because it destroys the microorganisms without forming byproducts that pose a significant adverse risk to human health, e.g., chloramines and chlorinated organic compounds. Chlorine dioxide is an effective antimicrobial agent at a concentration as low as 0.1 ppm and over a wide pH range. It is thought to penetrate cell walls and cell membranes and react with vital amino acids in the cytoplasm of the cell to kill the organism.

Unfortunately, chlorine dioxide is not stable during storage and can be explosive at high concentrations. As a result, chlorine dioxide gas is not produced and shipped under pressure. It must generally be generated on site using conventional chlorine dioxide generators or other means of generation. Conventional chlorine dioxide generation can be carried out in an efficient manner in connection with large-scale operations such as those in pulp and paper or water treatment facilities. In other applications, however, generating chlorine dioxide on site is not a good option. Conventional on-site chlorine dioxide generation can be costly, cumbersome and difficult because of the need for a generator and the need to handle the generator and the chemicals associated with the generation process.

Chlorine dioxide can also be generated by combining chlorite anions and acid in an aqueous solution. Typically, an acid is added to a solution containing in the range of from about 0.01 to about 32 percent by weight sodium chlorite and having a pH in the range of from about 8 to about 13. The acid can be any acid capable of lowering the pH of the solution to a level below about 7. For example, when approximately 10 grams of citric acid powder are added to an aqueous solution containing approximately 3.35% by weight sodium chlorite, the pH of the solution is lowered to about 2.9 and a solution containing approximately 7% by weight chlorine dioxide is formed.

A solution of a metal chlorite and water wherein the pH of the solution is maintained at 8 or above is sometimes referred to as a stabilized chlorine dioxide solution. Unfortunately, stabilize chlorine dioxide solutions are of limited use if they are needed at remote locations because of the difficulty and expense associated with handling and shipping the solutions. Also, in order to activate a "stabilized" chlorine dioxide solution, the pH of the solution must be lowered to below 5, typically to a range of from about 2 to about 3. Although lowering the pH of the solution to such a level can be done on site, it is not typically a good alternative because of the danger associated with handling acids manually (e.g., the danger associated with inadvertent skin contact and inhalation of acid vapors).

In order to avoid the difficulty of using conventional chlorine dioxide generators, the expense associated with handling and shipping stabilized chlorine dioxide solutions and related precursor solutions and the dangers associated with activating chlorine dioxide solutions, dry compositions

**2**

containing chemicals (e.g., sodium chlorite and acid) that react to form chlorine dioxide when placed in water have been developed. The compositions can be easily shipped to remote locations in dry form. The necessary water can be merely added on site. For example, in an application wherein a disinfectant solution is needed to clean surfaces, a dry composition containing a metal chlorite and an acid can be mixed with water on site which causes the components to react and produce an aqueous chlorine dioxide solution. The solution is then used to disinfect the surfaces. The aqueous chlorine dioxide solution is produced (chlorite anion is converted to chlorine dioxide) according to the following equation:

$$5ClO_2^- + 5H^+ \rightarrow 4ClO_2 + HCl + 2H_2O$$

Dry compositions for generating chlorine dioxide solutions are known in the art. For example, U.S. Pat. No. 2,022,262, issued to White on Nov. 26, 1935, discloses stable stain-removing compositions made from a dry mixture of water-soluble alkaline chlorite salt, an oxalate and an acid. U.S. Pat. No. 2,071,091, issued to Taylor on Feb. 16, 1937, discloses the use of chlorous acid and chlorites to kill fungi and bacterial organisms by exposing the organisms to the compounds at a pH of less than about 7. The patent also discloses using dry mixtures of chlorites and acids to produce stable aqueous solutions useful as bleaching agents. U.S. Pat. No. 2,482,891, issued to Aston on Sep. 27, 1949, discloses stable, solid, substantially anhydrous compositions comprising alkaline chlorite salts and organic acid anhydrides which release chlorine dioxide when contacted with water.

Canadian Patent No. 959,238, issued to Callerame on Dec. 17, 1974, discloses using two water-soluble envelopes, one containing sodium chlorite and one containing an acid, to generate chlorine dioxide. The envelopes are placed in water and the sodium chlorite and acid dissolve in the water and react to produce a chlorine dioxide solution. U.S. Pat. No. 2,071,094, issued to Vincent on Feb. 16, 1937, discloses deodorizing compositions in the form of dry briquettes formed of a mixture of soluble chlorite, an acidifying agent, and a filler of relatively low solubility. Chlorine dioxide is generated when the briquettes contact water.

U.S. Pat. No. 4,585,482, issued to Tice et al. on Apr. 29, 1986, discloses a long-acting biocidal composition comprising a microencapsulated mixture of chlorite and acid that when added to water releases chlorine dioxide. The primary purpose of the microencapsulation is to provide for hard particles that will be free flowing when handled. The microencapsulated composition also protects against water loss from the interior of the microcapsule. The microcapsules produce chlorine dioxide when immersed in water. Unfortunately, the microcapsules release chlorine dioxide relatively slowly and are therefore not suitable for applications that require the preparation of chlorine dioxide on a relatively fast basis.

PCT Application PCT/US98/22564 (WO 99/24356), published on May 20, 1999, discloses a method and device for producing chlorine dioxide solutions wherein sodium chlorite and an acid are mixed and enclosed in a semi-permeable membrane device. When the device is placed in water, water penetrates the membrane. The acid and sodium chlorite dissolve in the water and react to produce chlorine dioxide. The chlorine dioxide exits the device through the membrane into the water in which the device is immersed producing a chlorine dioxide solution that can be used as an antimicrobial solution or for other purposes. The primary disadvantage of the disclosed device and method is that ambi-

US 6,764,661 B1

3

ent moisture can penetrate the semi-permeable membrane and initiate the reaction prematurely.

In general, the prior art devices and methods using membranes are susceptible to premature activation by water or water vapor and therefore have a reduced shelf life unless sufficient steps are taken to protect the devices from exposure to ambient moisture or water. Such devices and methods are typically slow to interact with water and produce the desired chlorine dioxide. Also, in order to comply with U.S. Department of Transportation and other regulations, many prior art devices require that special and sometimes burdensome handling and shipping procedures be utilized in connection with the devices. For example, if sodium chlorite and acid are packaged together, certain restrictions may apply.

As a result, there is a need for a device for producing an aqueous chlorine dioxide solution that has an extended shelf life compared to prior art devices, that is not susceptible to activation by ambient moisture, that forms a chlorine dioxide solution much more quickly than prior art devices and that can be assembled and packaged in ways that avoid stringent handling and shipping regulations.

## SUMMARY OF THE INVENTION

In accordance with the invention, a device for producing an aqueous chlorine dioxide solution when exposed to water is provided. The device comprises a membrane shell defining a compartment which includes one or more dry chemical components capable of producing chlorine dioxide gas when exposed to water. Wick means are connected to the membrane shell and extend into the compartment for absorbing water and transporting water into the compartment whereby when the device is exposed to water the wick member absorbs water and transports water into the compartment, the chemical component(s) dissolve in the water and produce chlorine dioxide gas in the compartment, and chlorine dioxide gas exits the compartment through the membrane shell.

In a preferred embodiment, the compartment of the device includes a metal chlorite component and an acid component. In use, for example, the device is submersed in a container of water. The wick means quickly absorbs water and transports the water into the compartment. Metal chlorite and acid in the compartment then dissolve in the water and react to produce chlorine dioxide gas in the compartment. The chlorine dioxide gas passes through the membrane shell and transforms the water in the container into a chlorine dioxide solution. The solution can be used, for example, to disinfect surfaces or for a variety of other purposes as known in the art.

In one embodiment, the membrane shell is substantially impervious to liquid (e.g., water) but permeable to gas (e.g., chlorine dioxide gas). In another embodiment, the membrane shell is permeable to both liquid (e.g., water) and gas (e.g., chlorine dioxide gas).

In another embodiment, the wick means is a wick member having a first end that extends into the compartment and an opposing second end that extends beyond the outer edge of the membrane shell. In yet another embodiment, the wick means is a wick member that divides the compartment into first and second compartment sections. For example, the first compartment section can contain exclusively the metal chlorite component and the second compartment section can contain exclusively the acid component. This helps prevent the metal chlorite component and acid component from prematurely reacting. For example, in the event that a small

4

amount of moisture accumulates in the device, the wick member will prevent a reaction that might otherwise occur. In another embodiment, the wick means is a wick member that divides the compartment into a plurality of compartment sections. For example, the metal chlorite component can be isolated in one compartment section, the acid component can be isolated in a second compartment section, and a surfactant or some other additive can be isolated in a third compartment section. In another embodiment, the wick means comprises at least two wick members, the wick members dividing the compartment into at least two compartment sections.

The inventive device is very useful for relatively small applications, for example where expensive chlorine dioxide generation equipment is not economically feasible.

An important advantage of the inventive device is that it can be modified to meet applicable shipping and handling regulations. For example, in one embodiment, the device is packaged to include a metal chlorite component together with any additives employed for the particular application. The compartment of the device includes a sealable opening therein for allowing the acid component to be placed in the compartment at the point of use (e.g., just prior to submersing the device to water). The acid component is separately packaged with the device; for example, it can be in tablet form. Prior to placing the device in water, the user merely inserts the acid in the device and seals the opening. By packaging the acid component separately, inadvertent premature exposure of the device to water (even a substantial amount of water) will not cause the chemicals to react. As a result, less stringent regulations regarding shipping and handling the device may apply.

If necessary or desirable for the end-use application, a weight can be attached to one of the membrane shell and the wick means (e.g., placed into the compartment) or otherwise incorporated into the device (e.g., formed as part of the wick member) to ensure that the device is immersed when it is placed in a body of water. Although it is not critical to do so, the device can also be packaged in a water-resistant envelope (e.g., a foil pouch) in order to minimize the risk of the device being inadvertently exposed to water prior to use. Also, for particular applications, the membrane shell can include a plurality of small openings for facilitating the passage of liquid (e.g., water) into and out of the device and decreasing the time required for the chlorine dioxide solution to be produced.

It is, therefore, an object of the present invention to provide a device that effectively produces an aqueous chlorine dioxide solution when exposed to water but has a stable shelf-life prior to exposure to water.

It is also an object of the present invention to provide such a device that is not susceptible to activation by ambient moisture.

It is a further object of the present invention to provide such a device that is less costly to produce and manufacture than other devices for producing aqueous chlorine dioxide solutions presently on the market.

It is yet another object of the present invention to provide a device that produces an aqueous chlorine dioxide solution in a relatively short amount of time when compared to prior art devices.

Still another object of the invention is to provide such a device that can be modified to meet applicable shipping and handling regulations.

Additional objects, features and advantages of the present invention will be readily apparent to those skilled in the art

US 6,764,661 B1

5

upon a reading of the detailed description of preferred embodiments of the invention which follows when taken in conjunction with the accompanying drawings.

BRIEF DESCRIPTION OF THE SEVERAL
VIEWS OF THE DRAWING

FIG. 1 is a front perspective view of one embodiment of the inventive device;

FIG. 2 is a cross-sectional view taken along line 2—2 of FIG. 1;

FIG. 3 is a cross-sectional view taken along line 3—3 of FIG. 1;

FIG. 4 is a front perspective view of another embodiment of the inventive device;

FIG. 5 is a front elevational view of the device shown by FIG. 4;

FIG. 6 is a cross-sectional view taken along line 6—6 of FIG. 4, or line 6—6 of FIG. 5;

FIG. 7 is a front elevational view of the device shown by FIGS. 4–6 as modified to include a plurality of openings in the outer membrane shell;

FIG. 8 is a front elevational view of yet another embodiment of the inventive device;

FIG. 9 is a cross-sectional view taken along line 9—9 of FIG. 8;

FIG. 10 is a cross-sectional view similar to the view shown by FIG. 9 but illustrating yet another embodiment of the inventive device;

FIG. 11 is a front perspective view of yet another embodiment of the inventive device;

FIG. 12 is a cross-sectional view taken along line 12—12 of FIG. 11;

FIG. 13 is a front perspective view of yet another embodiment of the inventive device;

FIG. 14 is a cross-sectional view taken along line 14—14 of FIG. 13;

FIG. 15 is a front elevation view of a component of the device shown by FIGS. 13 and 14;

FIG. 16 is a front elevation view of a component of yet another embodiment of the inventive device;

FIG. 17 is a cross-sectional view similar to the view shown by FIG. 14 except it shows the embodiment of the inventive device to which FIG. 16 relates;

FIG. 18 is a view similar to the view shown by FIG. 14 except it shows another embodiment of the inventive device;

FIG. 19 is a view similar to the view shown by FIG. 17 except is shows yet another embodiment of the inventive device;

FIG. 20 is a front elevation view of yet another embodiment of the inventive device;

FIG. 21 is a cross-sectional view taken along line 21—21 of FIG. 18;

FIG. 22 is a rear elevation view of the embodiment of the inventive device shown by FIGS. 20 and 21;

FIG. 23 is a cross-sectional view taken along line 23—23 of FIG. 22; and

FIG. 24 is a front elevation view of a container of water having the inventive device submersed therein.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS OF THE
INVENTION

Referring now to the drawings and particularly to FIGS. 1–3, a first embodiment of the inventive device for produc-

6

ing an aqueous chlorine dioxide solution when the device is exposed to water is illustrated and generally designated by the numeral 20. As used herein, the term aqueous chlorine dioxide solution shall encompass both solutions containing chlorine dioxide and solutions containing acidified chlorite.

The device 20 comprises a membrane shell 22 and a wick member 24. The membrane shell defines a compartment 30 which includes one or more dry chemical components capable of producing chlorine dioxide gas when the device is exposed to water (i.e., contacted with sufficient water to cause the device to produce chlorine dioxide in its intended manner). The device is preferably exposed to water by placing or submersing it in a container of water.

The dry chemical components capable of producing chlorine dioxide gas upon exposure to water are preferably a metal chlorite component 32 and an acid component 34. Additives such as a catalyst for enhancing the reaction of the metal chlorite and acid, generally designated by the reference numeral 36, can also be included in the compartment 30. As used herein and in the intended claims, the term "dry chemical components" means chemical components in stable, solid, substantially anhydrous form.

The wick member 24 is connected to the membrane shell 22 and extends into the compartment 30. The wick member 24 functions as a wick in that it rapidly absorbs water from outside the device and transports the absorbed water into the compartment 30. For example, metal chlorite, acid and/or other chemicals in the compartment 30 dissolve in the absorbed water and react to produce chlorine dioxide gas. The chlorine dioxide gas efficiently exits the compartment 30 through the membrane shell 22 and possibly, to some extent, through the wick member 24.

The wick member 24 can be connected to the membrane shell 22 by being directly or indirectly fastened to a portion of the shell or by being merely inserted into the compartment 30. Due to a difference in the pressure outside the device 20 and the pressure in the compartment 30, the wick member 24 transports water into the compartment at a much faster rate than it allows water and/or solution to escape the device.

As shown by FIGS. 1–3, the membrane shell 22 is defined by two square panels 22A and 22B sealed together such that the compartment 30 is formed between the panels. The panels 22A and 22B are approximately the same size and form an outer edge 40 of the membrane shell 22. The outer edge 40 of the membrane shell 22 includes a top edge 42, bottom edge 44, side edge 46 and side edge 48. The panels 22A and 22B are sealed together along a line 50 which extends around the periphery of the panels just inside of the outer edge 40 of the membrane shell 22. Specifically, the seal extends along the line 50A adjacent to the top edge 42, along the line 50B adjacent to the side edge 46, along the line 50C adjacent to the bottom edge 44, and along the line 50D adjacent to the side edge 48 of the outer edge 40 of the membrane shell 22.

The panels 22A and 22B can be sealed together by a variety of means including stitching, heating and gluing. Preferably, the panels 22A and 22B are sealed together by stitching.

As shown, the wick member 24 is a rectangular sheet positioned between the panels 22A and 22B. The wick member 24 includes a bottom end 60 positioned in the compartment 30, an opposing top end 62 extending beyond the outer edge 40 of the membrane shell 22, and a first side 64 and second side 66 connecting the top and bottom ends and completing an outer periphery 68 of the wick member. Preferably at least 15% of the outer periphery of the wick

US 6,764,661 B1

7

member 24 extends beyond the outer periphery of the membrane shell 22.

In the embodiment shown by FIGS. 1–3, the wick member 24 is sealed between the panels 22A and 22B only along the line 50A adjacent the top end 62 of the wick member. This allows the various chemicals in the compartment 30 to commingle.

A weight 70 is inserted in the compartment 30 to ensure that the device sinks or is otherwise immersed when placed in a body of water. The weight can be attached to the device by other means as well; e.g., it can be attached to or formed as part of the membrane shell 22 and/or wick member 24. The size and shape of the weight 70 can vary depending on the size of the device 20 in general, the intended application and manufacturing and packaging concerns. The weight 70 can be formed of a variety of materials. It is important for the particular material used, however, to be inert with respect to the chemicals in the device. Preferably, the weight is formed of stainless steel.

In order to reduce the chance of a premature exposure of the metal chlorite component 32, acid component 34, additive(s) 36 and/or other chemicals in the compartment 30 to water, the membrane shell 22 and the wick member 24 can optionally be enclosed and sealed in a water-resistant package 74. The package 74 can be formed of a variety of materials. Preferably, the package 74 is a foil-laminated pouch.

The shape and size of the panels 22A and 22B and the corresponding compartment 30 can vary depending primarily on the amount of chemicals needed for the particular application (e.g., the amount of metal chlorite and acid needed for the desired amount and concentration of chlorine dioxide solution). Methods for calculating the amount of metal chlorite and acid needed to produce a given volume and concentration of chlorine dioxide solution are known to those skilled in the art. Additional factors affecting the size and shape of the panels 22A and 22B and the membrane shell 22 in general include the type of material used to form the panels, the intended application, packaging concerns and material compatibility. The panels 22A and 22B are preferably square or rectangular in shape in order to facilitate the step of fastening (e.g., stitching) the panels together.

The panels 22A and 22B and hence the membrane shell 22 are formed of a material and put together such that they function as a semi-permeable membrane. The membrane shell 22 (including the panels 22A and 22B) must be permeable to chlorine dioxide gas. Preferably, the membrane shell 22 is substantially impervious (most preferably completely impervious) to liquid (e.g., water). In this embodiment, water enters the device and solution exits the device only by way of the wick member 24. Chlorine dioxide gas generated by, for example, the reaction of chlorite ions and acid in the compartment 30 exits the device through the membrane shell 22 (i.e., the panels 22A and 22B) and possibly, to some extent, the wick member 24. The aqueous solution formed in the device is confined, for the most part, to the device. By preventing the aqueous solution formed and associated dissolved or solid chemicals from escaping the device through the membrane shell 22, the reaction is more complete and can be more easily controlled. Such a setup is desirable in applications wherein the amount of chlorine dioxide generated is critical and needs to be precisely controlled. For example, small amounts of water inadvertently encountered by the device will not enter the compartment 30 and cause premature reaction of the chemicals therein (a small amount of water is merely absorbed and held by the wick member 24).

8

In another embodiment, the membrane shell 22 is permeable to liquid (e.g., water and chlorine dioxide solution) and gas (e.g., chlorine dioxide gas). In this embodiment, water can enter the device and aqueous solution that is formed in the device can exit the device by way of the membrane shell 22. This decreases the amount of time required for the desired chlorine dioxide solution to be generated and is desirable in applications wherein the level of activation is low and immediate use of the solution is desired.

The permeability of the panels 22A and 22B with respect to gas and/or water can be the same or not the same depending on the desired function of the device. For example, the panel 22A can allow water to pass into one side of the compartment 30 while the panel 22B does not allow water to pass into the compartment 30.

The selected permeability of the panels 22A and 22B and hence the membrane shell 22 with respect to gas (e.g., chlorine dioxide) and liquid (e.g., water) is initially a function of the material composite and can be modified by mechanically, chemically and/or structurally altering the material. For example, as described below, a plurality of small openings can be formed in one or both of the panels 22A and 22B to facilitate the passage of liquid into and out of the compartment 30. Also, one or both of the panels 22A and 22B can be coated with various materials to alter the permeability thereof.

The membrane shell 22 (including the panels 22A and 22B) can be made of any membrane material that allows the membrane shell to function as described above; e.g., that allows the membrane shell to be substantially impervious to water but permeable to chlorine dioxide gas. For example, the membrane shell 22 (including the panels 22A and 22B) can be made from fibers. The fibers can be hydrophilic, hydrophobic or any combination thereof The fibers can be naturally occurring and/or synthetic, and can be woven or non-woven. Additionally, the fibers may be coated or non-coated. For example, the fibers can be coated to seal the fibers to each other or to other materials such as in a laminate composite.

Suitable synthetic fibers for forming the membrane shell 22 include polyvinyl chloride, polyvinyl fluoride, polytetrafluoroethylene, polyvinylidene chloride, polyacrylics such as Orlon® polyvinyl acetate, polyethylvinyl acetate, non-soluble or soluble polyvinyl alcohol, polyolefins such as polyethylene and polypropylene, polyamides such as nylon, polyesters such as Dacron® or Kodel® polyurethanes, polystyrenes and the like.

Suitable water impervious materials for forming the membrane shell 22 include microporous non-woven hydrophobic polymer sheet materials including non-woven polyethylene (e.g., Tyvek® brand materials sold by E.I. Du Pont de Nemours & Co.), microporous non-woven polypropylene materials, expanded polytetrafluoroethylene (e.g., Gore-Tex® brand sold by W.L. Gore), and kraft paper (e.g., X-Crepe-N Grade 4502 sold by Oliver Products Co.). Suitable water-permeable membrane materials include gelatin, polyvinyl alcohol, cellulose, and cellulose derivatives such as hydroxypropyl methyl cellulose. Other water permeable and water impermeable membrane materials suitable for use in forming the membrane shell 22 (including the panels 22A and 22B) are known to those skilled in the art and are included within the scope of the present invention.

The panels 22A and 22B and hence the membrane shell 22 in general are preferably formed of a polyolefin material such as polyethylene and polypropylene. Most preferably, the panels 22A and 22B and hence the membrane shell 22 in general are formed of a microporous non-woven polyethylene.

US 6,764,661 B1

9

The shape and size of the wick member 24 can vary depending on the size of the compartment 30, the water absorption rate desired, the type of material used to form the wick member, the intended application, packaging concerns and material compatibility. In the embodiment shown in FIGS. 1–3, the wick member 24 is almost as wide and extends almost to the bottom of the compartment 30. Approximately 1/9th of the length of the wick member 24 extends beyond the outer edge 40 of the membrane shell 22. These features allow the wick member 24 to absorb and transport a relatively large amount of water on a relatively rapid basis. In order to increase the surface area of the wick member 24 to be exposed to the water even further, for example, the bottom end 60 of the wick member can also extend beyond the outer edge 40 of the membrane shell 22. As long as the wick member 24 is not sealed to the panels 22A and 22B around all of its edges, commingling of the chemicals will occur, at least to some extent.

In an application where a relatively slow release of chlorine dioxide is desired, the wick member 24 can be formed of a material that has a relatively slower wicking rate such that water is transported more slowly into the compartment 30. Alternatively, the surface area of the wick member 24 extending outside of the device can be decreased so as to slow down the water absorption rate. For example, the wick member can be a small cylindrical rope extending into the compartment 30.

The wick member 24 can be made out of a large variety of materials. For example, in the preferred embodiment, the wick member can be made of virtually any material capable of quickly absorbing water and transporting the absorbed water into the device. For example, the material used to form the wick member 24 may be made of synthetic fibers, naturally occurring fiber(s) (both modified and unmodified) or both. The fibers can include hydrophilic fibers, hydrophobic fibers or a combination of hydrophilic and hydrophobic fibers.

Examples of suitable natural fibers for the wick member 24 include cotton, Esparto grass, bagasse, hemp, flax, silk, wool, wood pulp, chemically modified wood pulp, jute, rayon, ethyl cellulose, and cellulose acetate. Suitable synthetic fibers can be made from polyvinyl chloride, polyvinyl fluoride, polytetrafluoroethylene, polyvinylidene chloride, polyacrylics such as Orlon®, polyvinyl acetate, polyethylvinyl acetate, non-soluble and soluble polyvinyl alcohols, polyolefins such as polyethylene and polypropylene, polyamides such as nylon, polyesters such as Dacron® and Kodel®, polyurethanes, polystyrenes and the like. In order to function as a wick, certain synthetic fibers may require some modification (e.g., formed into laminates, etc.). The desired wicking action can result form absorption of water, capillary action and/or other mechanisms.

The wick member 24 is preferably formed of one or more natural fibers. More preferably, the wick member 24 is selected from the group consisting of cotton and wood pulp. Most preferably, the wick member is formed of non-synthetic fibers of cotton.

As known to those skilled in the art, the specific type of metal chlorite component, acid component and additive(s) employed in connection with the inventive device 20 will vary depending on numerous factors including the intended application for the device, packaging concerns and material compatibility. The reaction of a metal chlorite with an acid to generate chlorine dioxide is well known.

As used herein, the term "metal chlorite component" means a compound which is a metal chlorite or which forms

10

a metal chlorite when exposed to water and/or the acid component. The metal chlorite component generally comprises a metal chlorite selected from the group consisting of alkali metal chlorites, alkaline earth metal chlorites and mixtures thereof Preferably, the metal chlorite component is selected from the group consisting of sodium chlorite, potassium chlorite, barium chlorite, calcium chlorite, and magnesium chlorite, more preferably from the group consisting of sodium chlorite, calcium chlorite, potassium chlorite and mixtures thereof Most preferably, the metal chlorite component is sodium chlorite ($NaClO_2$), particularly dry technical grade sodium chlorite (containing about 80% by weight sodium chlorite and 20% by weight sodium chloride).

As used herein, the term "acid component" means a compound which is acidic or which produces an acidic environment in the presence of water sufficient to activate or react with the metal chlorite component such that chlorine dioxide is produced. For example, the acid component can include an organic acid, a mineral acid or mixtures thereof. It is preferably a dry solid hydrophilic compound which does not substantially react with the metal chlorite until the chemicals are dissolved in water. Examples of organic acids that can be used include citric acid, boric acid, lactic acid, tartaric acid, maleic acid, malic acid, glutaric acid, adipic acid, acetic acid, formic acid, sulfamic acid and mixtures thereof. Examples of mineral acids that can be used include sulfuric acid, hydrochloric acid, phosphoric acid and mixtures thereof Preferred mineral acids are those that are of food grade quality such as phosphoric anhydride and sulfuric anhydride. Alternatively, an acid precursor that produces an acid when exposed to water can be used. Examples of suitable acid precursors include water soluble organic acid anhydrides such as maleic anhydride, and water soluble acid salts such as calcium chloride, magnesium chloride, magnesium nitrate, lithium chloride, magnesium sulfate, aluminum sulfate, sodium acid sulfate, sodium dihydrogen phosphate, potassium acid sulfate, potassium dihydrogen phosphate, and mixtures thereof Additional water-soluble acid forming precursors are known to those skilled in the art.

Of the organic acids, citric acid is most preferred. Of the mineral acids, phosphoric acid is most preferred. Preferably, the acid component is an organic acid. Most preferably, due to its food grade status, cost and low toxicity, the acid component is food grade, anhydrous citric acid.

As understood by those skilled in the art, the amounts of metal chlorite and acid that should be placed in the component will vary depending on the size of the compartment 30, the concentration of chlorine dioxide in the solution desired and the desired pH of the final solution. Preferably, the ratio of acid to metal chlorite in the compartment 30 is in the range of from about 5:1 to about 1:100, more preferably in the range of from about 1:1 to about 1:10.

The types and amounts of additive or additives included in the compartment 30 will also vary depending on the intended application, the types of metal chlorite and acid used, packaging concerns and material compatibility. Examples of additives that can be employed include adhesives, thickeners, penetrating agents, stabilizers, surfactants, binders, organic solids, inorganic solids, catalysts and other components that enhance the ability of the device to produce chlorine dioxide when exposed to water.

A catalytic amount of a catalyst selected from the group consisting of a transition metal, a transition metal oxide and mixtures thereof can be included in the compartment 30 to speed up the reaction. The use of such catalysts is disclosed

US 6,764,661 B1

**11**

by U.S. Pat. No. 5,008,096, issued to Ringo on Apr. 16, 1991, which is incorporated by reference herein.

The metal chlorite component, acid component and any additive(s) utilized in connection with the device 20 can be in any physical form which can be contained within the device in dry form; e.g., powders, granules, pellets, tablets, agglomerates and the like. Preferably, the components are in powder form because powders tend to dissolve in water and react more quickly when compared to large particles such as pellets or agglomerates.

The metal chlorite and acid can each be impregnated on inert carriers that are chemically compatible with the components, e.g., zeolite, kaolin, mica, bentonite, sepiolite, diatomaceous earth, and synthetic silica. Other such carriers are known to those skilled in the art. For example, a carrier can be useful to control the release of the chlorite and acid into solution and thus control the reaction even further. Such a carrier is preferably insoluble in water.

The types of metal chlorites, acids and additives that can be employed and well as the amounts of components, reaction conditions and other involved parameters are described in Canadian Patent No. 959238 and PCT Application No. PCT/US98/22564, which are incorporated by reference herein.

Referring now to FIGS. 4–6, a second embodiment of the inventive device 20 will be described. This embodiment of the device 20 is the same as the embodiment shown by FIGS. 1–3 and described above except for the size of the wick member 24 and the way that the wick member is fastened to the membrane shell 22.

In the embodiment shown by FIGS. 4–6, the wick member 24 is of a size such that the entire outer periphery 68, including the bottom end 60, top end 62, first side 64 and second side 66, of the wick member extends beyond the entire outer edge 40 of the membrane shell 22. The wick member 24 is sealed to the panels 22A and 22B of the membrane shell 22 along the entire line 50, that is continuously along line 50A, 50B, 50C, and 50D. Due to the fact that the entire outer periphery 68 of the wick member 24 extends beyond the outer periphery 40 of the membrane shell 22, the wick member 24 is able to absorb and transport water into the compartment at a faster rate. Due to the fact that it is sealed to the panels 22A and 22B of the membrane shell 22 along the entire line 50, the wick member 24 functions to divide the compartment 30 into a first compartment section 30A and a second compartment section 30B.

In the embodiment shown by FIGS. 4–6, the metal chlorite component is preferably contained exclusively in one compartment, say compartment section 30A, and the acid component is contained exclusively in the other compartment, say compartment section 30B (the additive(s) 36 can be placed in one or both compartment sections). The compartment division further prevents a premature reaction of metal chlorite and acid in the event of an inadvertent exposure to water prior to the intended use of the device. For example, when the device 20 is immersed in water in accordance with its intended use, the wick member 24 absorbs a relatively large amount of water and transports the water into the first and second compartment sections 30A and 30B such that metal chlorite in the first compartment section and acid in the second compartment section contact the water, dissolve in the water, traverse the wick divider, come into contact with one another and react to produce chlorine dioxide in the compartment 30. A small amount of water will not be sufficient to allow the components to traverse the wick divider and react. It is only when a

**12**

substantial amount of water enters the device that the metal chlorite and acid component come into contact with one another to generate chlorine dioxide. A small amount of water vapor that may enter the device through the membrane shell 22 is absorbed by the chemicals.

The wick divider 24 gives the inventive device a longer shelf life than the shelf life of the prior art devices and allows the device to be produced in normal environments (as compared to low humidity environments required for production of prior art devices). Special moisture-resistant packaging is not required to protect against ambient moisture exposure.

Additional uses of the first and second compartment sections 30A and 30B of the embodiment shown by FIGS. 4–6 can be advantageously made to fit particular applications. For example, a mixture of the metal chlorite component and acid component can be placed in both compartment sections. This arrangement is advantageous in that the reaction occurs more quickly. Alternatively, a mixture of the metal chlorite component and acid component can be placed in one compartment section and one or more additives can be placed in the second compartment section. This arrangement might be advantageous in applications wherein the additive might prematurely react with the metal chlorite and acid.

The embodiment shown by FIG. 7 is the same as the embodiment shown by FIGS. 4–6 except the membrane shell 22 (including both the panel member 22A and the panel member 22B) includes a plurality of relatively small openings 80 (e.g., 50–500 microns in diameter) extending from the outside of the membrane shell into the first and second compartment sections 30A and 30B. The openings 80 facilitate the passage of liquid (e.g., water and aqueous solution of chlorine dioxide) into and out of the compartment 30. The openings 80 can further reduce the amount of time required for the desired aqueous chlorine dioxide solution to be generated. Each embodiment of the inventive device can include similar openings.

Referring now to FIGS. 8 and 9, another embodiment of the inventive device 20 is illustrated and will be described. The embodiment shown by FIGS. 8 and 9 is the same as the embodiment shown by FIGS. 4–6, except that an additional seal is made through the device along a line 50E which extends from the line 50B across the middle section of the device to the line 50C. The seal (e.g. formed by stitches) extends from the outside of the panel member 22B though the wick member 24 to the outside of the panel member 22A to effectively divide the compartment into four (4) compartment sections, 30A1, 30A2, 30B1 and 30B2. The plurality of compartments is useful for various applications. For example, as shown by FIG. 9, an acid component 34 can be placed in compartment section 30A1, a metal chlorite component 32 can be placed in compartment section 30B1, a first additive 36A can be placed in compartment section 30B2 and a second additive 36B can be placed in compartment section 30A2. This arrangement is useful in applications wherein the release of one or more additives requires special conditions. For example, if a surfactant needs more water to function than will be brought in by the wick member, small perforations can be made in the membrane shell over the section of the device containing the surfactant to allow more water to enter into this section of the device when the device is placed in water.

FIG. 10 illustrates an embodiment of the invention that is the same as the embodiment shown by FIGS. 8 and 9 except the that the seal made through the device along line 50E only

US 6,764,661 B1

13

extends from the outside of the panel section 22B to the wick member 24 thus creating a device having three compartment sections, 30A, 30B1 and 30B2. Again, the number of compartment sections can be varied to suit virtually any application.

Referring now to FIGS. 11 and 12, yet another embodiment of the inventive device 20 is illustrated. This embodiment is the same as the embodiment shown by FIGS. 4–6 except that it includes two wick members 24, 24A and 24B. The wick members 24A and 24B are sealed together with two the panel members 22A and 22B along the entire line 50, that is continuously along the line 50A, 50B, 50C and 50D. The use of two wick members 24 increases the wicking ability of the device 20 resulting in faster absorption and transport of water into the compartment 30. The use of two wick members also makes it possible to divide the compartment 30 into a large number of compartment sections. As shown by FIGS. 11 and 12, the wick members 24A and 24B divide the compartment 30 into compartment sections 30C, 30D and 30E. If desired, the device can be sealed along its mid-section (as in the embodiments shown by FIGS. 8–10) to create, for example, 5, 6 or virtually any number of compartment sections.

FIGS. 13–23 illustrate certain embodiments of the inventive device 20 that are designed to accommodate government regulations and restrictions regarding shipping and handling of the device. For example, certain federal and state Department of Transportation regulations may prevent the device from being shipped in a way that would allow the acid and metal chlorite to come into contact with one another in the event of accidental exposure to water unless the package for the device includes a warning such as "DANGEROUS WHEN WET" and special handling and shipping requirements are met.

Referring now to FIGS. 13–15, a first embodiment of the inventive device 20 that is designed to accommodate government regulations and restrictions is illustrated. This embodiment of the inventive device 20 is the same as the embodiment shown by FIGS. 4–7 in all respects except that the first compartment section 30A includes the metal chlorite component 32, and the second compartment section 30B includes a sealable opening 90 therein. The metal chlorite component 32 is sealed in the compartment 30A by the seal extending along the entire line 50, that is continuously along lines 50A, 50B, 50C and 50D. The seal along line 50A, however, does not extend through the panel 22A of the membrane shell 22, leaving the opening 90 in the compartment 30B. An adhesive strip 94 extends along the top portion of the device and is sealed to the device along the line 50A.

The acid component 34 is not initially placed in the device. Rather, the acid component 34 is placed in a separate package 98 (FIG. 15) which can be included in the main package 74 for the device. This prevents the acid component 34 and metal chlorite 32 from coming into contact with one another in the case of accidental exposure of the device to water. In this embodiment, the acid component 34 is preferably in the form of a tablet 96. Alternatively, for example, the acid component 34 can be an acid powder wrapped in a material with wicking action, preferably the same material used to form the wick member 24. The acid is placed in the device with the wrapping thereon. This further delays the reaction between the metal chlorite and acid and provides additional reaction control, if necessary, when the device is placed in water. The separate package 98 can be formed of any water impervious material (e.g., laminated foil).

Although the adhesive strip 94 is preferred, any means for resealing the opening 90 can be used. For example, Velcro®, buttons, clamps, staples, zippers or other sealing means can be used.

14

At the point of use, the user merely removes the acid component 34 (e.g., the tablet 96) from the package 98 and inserts it into the second compartment section 30B through the opening 90 therein (FIG. 14 shows the device with the acid tablet 96 already inserted therein). The user then merely seals the device by pressing the top portion of the panel member 22A against the adhesive strip 94 (typically a protective paper coating must first be removed from the adhesive strip 94) and places the device in water (at this point the device functions in the same manner as the device shown by FIGS. 4–7). The user also has the option to add other components, e.g., one or more additives, additional weights, etc. just prior to use of the device. If desired, the acid component 34 and/or one or more additives 36 can be initially sealed in the first compartment section 30A and the metal chlorite component 32 can be separately packaged for insertion at the point of use.

The same features (e.g., the opening 90 and adhesive strip 94) can be employed in connection with the other embodiments of the inventive device. For example, FIG. 18 illustrates an embodiment similar to the embodiment of the inventive device shown by FIGS. 1–3 (e.g., the wick member is not sealed on all sides allowing the chemicals to commingle) except it includes the opening 90, adhesive strip 94, etc.).

FIGS. 16, 17 and 19 illustrate a second embodiment of the inventive device 20 that is designed to accommodate government regulations and restrictions regarding shipping and handling of the device. In this embodiment, the device 20 further comprises a manually openable ampule 100. The ampule 100 is positioned in the second compartment section 30B and contains the acid component 34. The ampule 100 is impervious to water and thereby prevents the acid component 34 from coming into contact with the metal chlorite component 32 until the ampule is manually opened. Alternatively the ampule 100 can be positioned in the first compartment section 30A and contain the metal chlorite component 32.

The ampule 100 is merely a safety device—it prevents the acid component 34 from contacting the metal chlorite component 32 and/or other chemicals in the compartment 30 in the event the device is prematurely exposed to or even immersed in water. The device 20 is assembled with the ampule 100 sealed therein. At the point of use, prior to placing the device 20 in water, the user merely manipulates the device 20 to break the ampule 100 such that the acid component 34 is released therefrom into the compartment 30B. The device 20 then functions in its intended manner, e.g., in the same manner in which the embodiment of the device 20 shown by FIGS. 4–7 functions.

The ampule 100 can be made out of any water and acid impervious material. For example, the ampule 100 can be made out of polyvinyl chloride, glass or plastic. The ampule 100 is designed such that simple hand pressure can break the ampule open. For example, as shown by FIG. 16, the ampule 100 can include a weak point 102 which allows the ampule 100 to be easily broken open by the user.

Again, the same features (e.g., the ampule 100) can be employed in connection with all of the embodiments of the inventive device 20. For example, FIG. 19 illustrates use of ampule 100 in connection with the embodiment of the inventive device 20 shown by FIGS. 1–3; i.e., the acid component 34 is contained in the ampule 100 which is in turn sealed within the compartment section 30B. Inasmuch as the ampule contains the acid, this embodiment of the device functions similarly to the embodiment of the device

US 6,764,661 B1

**15**

shown by FIGS. 4–6 in that the metal chlorite component and acid component are not allowed to commingle prior to use of the device.

Referring now to FIGS. 20–23, yet another embodiment of the inventive device 20 designed to accommodate government regulations and restrictions regarding shipping and handling of the device is illustrated. This embodiment of the device consists of a kit 110 which allows the user to complete assembly of the device 20 at the point of use. The kit 110 includes a first chemical unit 112, a second chemical unit 130 and attachment means, such as an adhesive strip 140, attached to one of the first chemical unit and the second chemical unit for allowing the units to be attached together to assemble the device.

The first chemical unit 112 includes a first membrane shell 114 and a first wick member 116 connected to the first membrane shell and forming a first compartment section 118 between the first membrane shell and the first wick member. The first compartment section 118 contains the metal chlorite component 32. The first wick member 116 is capable of absorbing water and transporting water into the first compartment section 118. The first membrane shell 114 and first wick member 116 are sealed together along a line 150 (i.e., along lines 150A, 150B, 150C and 150D). A weight 170 is included in the first compartment section 118 for causing the assembled device to submerge when placed in water by the user.

The second chemical unit 130 includes a second membrane shell 132, a second wick member 134 connected to the second membrane shell and forming a second compartment section 136 between the second membrane shell and the second wick member. The second compartment section 136 contains the acid component 34. The second wick member 134 is also capable of absorbing water and transporting water into the second compartment section. The second membrane shell 132 and second wick member 134 are sealed together along a line 150 (i.e., along lines 150A, 150B, 150C and 150D).

An adhesive strip 140 is attached to the first wick member 116 of the first chemical unit 112 adjacent to the outer edge of the first wick member. The adhesive strip 140 allows the first chemical unit 112 and second chemical unit 130 to be attached together at the point of use. It is desirable that the adhesive strip 140 be as close to the outer edge of the wick member 116 as possible so as to not inhibit the flow of water and dissolved materials in and out of the compartments 118 and 136.

Except for the chemicals they contain and the adhesive strip 140 on the first chemical unit 112, the first chemical unit and second chemical unit 130 are essentially identical. Each unit is placed in an envelope 180 and placed in single package for shipment.

At the point of use, the user merely removes the first chemical unit 112, and second chemical unit 130 from their individual packages 180, removes the paper cover from or otherwise activates the adhesive strip 140 and sticks the two units together such that the first wick member 116 and second wick member 134 are in alignment and facing one another. The user then inserts the device in water (at this point the device functions in essentially the same manner as the device shown by FIGS. 4–7).

Although the adhesive strip 140 is preferred, any means for connecting the first chemical unit 112 and second chemical unit 130 together can be employed. For example, Velcro®, buttons, snaps, clamps or other attachment means can be used.

**16**

Production of the Inventive Device 20

Each embodiment of the inventive device 20, including the components of the kit 110, can be produced using a variety of methods. For example, in one method of producing the embodiments of the device 20 shown by FIGS. 1–7, the wick member 24 is placed between the panels 22A and 22B forming the membrane shell 22. In order to produce a device such as the device shown by FIGS. 4–6, the entire outer periphery 68 of the wick member 24 extends beyond the outer periphery 40 of the membrane shell 22. The panels 22A and 22B and wick member 24 are then sealed just inside the outer periphery 40 of the panels such that only a small opening allowing access to the compartment 30 between the panels remains. The metal chlorite composition and acid composition is then placed into the appropriate compartment section and the opening allowing access to the compartment 30 is sealed to completely enclose the compartment 30 as well as the compartment sections therein.

The panels 22A and 22B and wick member 24 can be sealed together by a variety of means such as gluing, heat sealing, pressure sealing, stapling or sewing. Preferably, the panels 22A and 22B are heat sealed to the wick member 24.

In producing the device illustrated by FIGS. 11 and 12, a panel 22A is placed on top of a corresponding wick member 24 and sealed just inside the outer periphery 40 of the panel 22A such that only a small opening remains for access to the compartment between the panel and the wick member. The metal chlorite component is then placed into the compartment and the opening allowing access to the compartment is sealed. The process is then repeated to create an identical arrangement containing the acid component. The two pouches are then placed together at the wick member surfaces and sealed together.

The embodiments of the device shown by FIGS. 13–23 can be produced in a similar fashion.

For example, in the embodiment shown by FIGS. 4–6 of the drawings, the panels 22A and 22B forming the membrane shell 22 are formed of a non-woven polyethylene material (Tyvek® brand sold by Du Pont). The wick divider 24 is made out of non-synthetic cotton fiber (e.g., Scott® paper towel). Approximately 0.5 grams of citric acid are contained in the first compartment section 38. Approximately 0.5 grams of sodium chlorite are contained in the second compartment section 30B. The device 20 is then immersed in approximately 1 liter of water to produce an aqueous solution containing approximately 100 ppm of chlorine dioxide. This solution can be used as a disinfectant or for a variety of other purposes.

Operation of the Inventive Device 20

In use, an embodiment of the inventive device 20, as described above, is first selected for the particular application involved (taking into account applicable shipping and handling regulations). The amount and concentration of chlorine dioxide solution to be generated is considered with respect to the amounts of the metal chlorite component, acid component and other chemicals utilized and the size of the device selected.

Generally, chlorine dioxide solutions useful as antimicrobial agents have a chlorine dioxide concentration of from about 0.1 ppm to about 1000 ppm. Therefore, one liter of a 50 ppm solution can be prepared by dissolving 0.5 grams of sodium chlorite in water. The amount of acid needed can be calculated accordingly. However, the acid is usually present in stoichiometric excess to ensure that the reaction goes to

US 6,764,661 B1

17

completion and the maximum amount of chlorine dioxide is generated from the metal chlorite. Therefore, the amount of acid should be sufficient to provide an excess of acid beyond that needed to neutralize the alkalinity of the metal chlorite in the water. Preferably, the amount of acid should be sufficient to maintain the pH below 5, preferably below 3, when in contact with the metal chlorite.

The device 20 is then contacted with (e.g., immersed in) a container 200 of water. As shown by FIG. 24, water is absorbed by the wick member 24 (or wick members 116 and 134) and transported by the wick member(s) into the compartment 30 or compartment sections 30A, 30B, 118, 136, etc. Metal chlorite and acid in the compartment or compartment sections then dissolve in the water and react to produce chlorine dioxide gas. If the metal chlorite, acid and other chemicals are separated by the wick member and contained in individual compartments, the chemicals individually dissolve in the water and the various aqueous solutions formed traverse the wick divider and commingle. Commingling of the solutions results in the reaction of the chemicals and the production of chlorine dioxide gas. The chlorine dioxide gas then exits the device through the membrane shell 22 and possibly, to some extent, the wick divider and transforms the surrounding water into an aqueous chlorine dioxide or acidified sodium chlorite solution. Some of the aqueous solution formed in the device may also enter the container of water through the wick member where the components may also react to produce additional chlorine gas.

Depending on the material used to form the membrane shell, water may also enter the device and aqueous solution may also exit the device through the membrane shell.

Thus, the present invention has many advantages over the prior art. The wick member (or members) carries out many important functions. First, it absorbs water and transports the water into the compartment(s) in the device in a controlled manner. The wick member (or members) greatly decreases the time required for water to get into the device yet keeps the chemicals in the device from prematurely reacting. The size, shape and number of compartments within the inventive device can be easily varied to fit virtually any application.

The embodiments of the device shown by FIGS. 13–23 allow the device to be easily packaged, shipped and handled providing the device with a tremendous advantage over the prior art devices used heretofore.

The following examples are provided to further illustrate the effectiveness of the inventive device.

EXAMPLE 1

A microporous, hydrophobic non-woven polyethylene sheet material (Tyvek® brand sold by E.I. Du Pont de Nemours & Co.—type 1059B) was cut and sealed with a heat-sealing device to make a single compartment pouch approximately 1 inch by 2 inches. The pouch was filled with a mixture of 0.5 grams powdered technical grade sodium chlorite and 0.5 grams powdered citric acid. The pouch was then heat sealed and placed into 500 mL tap water at a temperature of 75° F. The concentration of chlorine dioxide gas in the solution was measured with a spectrophotometer by recording the absorbance of the solution at 360 nm and using a molar absorptivity of 1,100 liters per mole-cm. Measurements were taken at five-minute intervals for 25 minutes. The results are shown in Table 1.

18

TABLE 1

| Time | Concentration |
|------|---------------|
| 5 minutes | 2.1 ppm |
| 10 minutes | 5.2 ppm |
| 15 minutes | 8.5 ppm |
| 20 minutes | 11.3 ppm |
| 25 minutes | 16.5 ppm |

The results show by Table 1 demonstrate that in the absence of a wick member, chlorine dioxide solutions are produced relatively slowly, e.g., it took approximately 25 minutes to produce a 16.5 ppm chlorine dioxide solution.

EXAMPLE 2

A microporous, hydrophobic non-woven polyethylene sheet material (Tyvek® brand sold by E.I. Du Pont de Nemours & Co.—type 1059B) was cut and sealed with a heat-sealing device to make a single compartment pouch approximately 1 inch by 2 inches. The pouch was then penetrated using a sewing needle so that approximately 30 holes about the size of the end of the needle (i.e., 0.05 mm) were made in the pouch. The pouch was filled with a mixture of 0.5 grams powdered technical grade sodium chlorite and 0.5 grams powdered citric acid. The pouch was then heat sealed and placed into 500 mL tap water at a temperature of 75° F. The concentration of chlorine dioxide gas was measured with a spectrophotometer by recording the absorbance of the solution at 360 nm and using a molar absorptivity of 1,100 liter per mole-cm. Measurements were taken at five-minute intervals for 20 minutes. The results are shown in Table 2.

TABLE 2

| Time | Concentration |
|------|---------------|
| 5 min. | 3.0 ppm |
| 10 min. | 12.2 ppm |
| 15 min. | 28.1 ppm |
| 20 min. | 29.3 ppm |

Table 2 demonstrates that the small perforations in the device allowed the water to enter the device more quickly and resulted is a faster production rate for the chlorine dioxide solution, e.g., it took 20 minutes to produce a 29.3 ppm solution.

EXAMPLE 3

The device of the present invention, in a form such as the embodiment shown by FIGS. 4–6, was constructed and compared to the prior art devices shown in Examples 1 and 2. The membrane shell (the panels 22A and 22B) was made of a microporous, hydrophobic non-woven polyethylene sheet material (Tyvek® brand sold by E.I. Du Pont de Nemours & Co.—type 1059B). The wick member 24 was made of Scott® brand "Ultrawipes" paper towel.

The membrane shell material and wick member were cut and sealed with a heat-sealing device to make the device (including first and second compartment sections) which was approximately 1 inch by 2 inches. The first compartment section was filled with 0.5 grams powdered technical grade sodium chlorite and the second compartment section was filled with 0.5 grams powdered citric acid. The pouch was then heat sealed and placed into 500 mL tap water at a temperature of 75° F. The concentration of chlorine dioxide

US 6,764,661 B1

19

20

gas was measured with a spectrophotometer by recording the absorbance of the solution at 360 nm and using a molar absorptivity of 1,100 liter per mole-cm. Measurements were taken at five-minute intervals for 15 minutes. The results are shown in Table 3.

TABLE 3

| Time | Concentration |
|------|---------------|
| 5 min. | 31.1 ppm |
| 10 min. | 39.7 ppm |
| 15 min. | 50.0 ppm |

Table 3 clearly shows that the device of the present invention produces chlorine dioxide solutions much more quickly than those of the prior art, e.g., it took only 15 minutes to produce a 50.0 ppm solution. The wick member rapidly absorbed water and transported the water into the device causing the metal chlorite and acid to dissolve, traverse the wick divider and react to produce chlorine dioxide in a relatively short amount of time. The chlorine dioxide immediately passed through the membrane shell to form the chlorine dioxide solution.

A number of inventive devices were assembled and tested as described above, except other types of paper towel material were used to form the wick member 24. Each device worked in the desired manner.

EXAMPLE 4

The inventive device was constructed as described above in Example 3. This time, however, each compartment section was filled with 0.25 grams of powdered technical grade sodium chlorite and 0.25 grams powdered citric acid so that the total amount of dry chemicals in the device was 1.0 grams. The pouch was then heat sealed and placed into 500 mL tap water at a temperature of 75° F. The concentration of chlorine dioxide gas was measured with a spectrophotometer by recording the absorbance of the solution at 360 nm and using a molar absorptivity of 1,100 liter per mole-cm. Measurements were taken at five-minute intervals for 10 minutes. The results are shown in Table 4.

TABLE 4

| Time | Concentration |
|------|---------------|
| 0 min. | 0 ppm |
| 5 min. | 41.48 ppm |
| 10 min. | 79.30 ppm |

Table 4 shows that the device of the present invention produces chlorine dioxide solutions even more quickly than those of the prior art when a mixture of metal chlorite and acid is placed in each compartment section, e.g., it took only 10 minutes to produce a 79.30 ppm solution.

| | PPM ClO₂ | | | | |
|---|---|---|---|---|---|
| | Time (Minutes) | | | | |
| | 5 | 10 | 15 | 20 | 25 |
| Example 1 | 2.1 | 5.2 | 8.5 | 11.3 | 16.5 |
| Example 2 | 3.0 | 12.2 | 28.1 | 29.3 | |
| Example 3 | 31.1 | 39.7 | 50.0 | | |
| Example 4 | 41.48 | 79.3 | | | |

Two 2.5"×3" pouches (P1 & P2) were produced in essentially the same manner described in Example 3 above, i.e.,

each pouch included a membrane shell formed of microporous, hydrophobic non-woven polyethylene sheet material (Tyvek® brand sold by E.I. Du Pont de Nemours & Co.—type 1059B). Pouch P1, however, did not include a wick member.

Each pouch was filled with 0.5 g citric acid and 0.5 g sodium chlorite. In pouch P1, the wick member (made of Scott® brand "Ultrawipes" paper towel) provided a two-compartment pouch and separated the citric acid from the sodium chlorite. In Pouch P2 (no wick divider) the sodium chlorite and citric acid were mixed together in the single compartment provided by the pouch.

Each pouch was tested in a 39-liter test chamber. In each test, the air inside the chamber was exchanged at a rate of 1.3 liters per minute and had a relative humidity of approximately 50%. The chlorine dioxide concentration inside the test chamber was monitored using an Interscan chlorine dioxide meter equipped with an Intech data logger. In each test, the atmosphere inside the test chamber was monitored for chlorine dioxide for ten minutes prior to introduction of the pouch, for two hours while the pouch remained inside the test chamber, and for ten minutes after the pouch was removed. If no chlorine dioxide was detected from the sample, a known chlorine dioxide emitter was placed inside the test chamber to verify the proper function of the test equipment. The results are described below.

Results P1: The chlorine dioxide concentration inside the test chamber never reached detectable limits during the two hour test period. The known chlorine dioxide emitter was placed in the test chamber at the end of the two hour test period and allowed to produce a chlorine dioxide gas concentration of 1.2 ppm chlorine dioxide to confirm test instrument function.

Results P2: Chlorine dioxide gas reached detectable limits within two minutes of sample introduction into the test chamber and reached an equilibrium concentration of about 2.96 ppm ClO₂ in about twenty minutes. This suggests a chlorine dioxide production rate of about 0.07 milligrams ClO₂ per hour.

The results show that a device constructed according to the present invention with a wick member divider separating the citric acid from the sodium chlorite minimizes or prevents the production of chlorine dioxide gas. Thus, the device of the present invention will not be activated by ambient moisture from the air and will have an extended shelf life.

EXAMPLE 6

The device of the present invention, in a form such as the embodiment shown by FIGS. 1–3, was constructed and compared to the prior art devices shown in Examples 1 and 2. The membrane shell (the panels 22A and 22B) was made of a microporous, hydrophobic non-woven polyethylene sheet material (Tyvek® brand sold by E.I. Du Pont de Nemours & Co.—type 1059B). The wick member 24 was made of Scott® brand "Ultrawipes" paper towel.

The device was approximately 1" by 2" in size and filled with a mixture of 0.5 grams technical grade sodium chlorite of 80% purity and 0.5 grams food grade citric acid. The device was then placed into 500 mL tap water with a temperature of about 73° F. The absorbance of the solution was measured with a spectrophotometer at a wavelength of 360 nm and then converted to a mg/l concentration of chlorine dioxide.

US 6,764,661 B1

21

TABLE 5

| Time | Concentration |
|------|---------------|
| 0 min. | 0 mg/l |
| 5 min. | 19.5 mg/l |
| 10 min. | 61.0 mg/l |
| 15 min. | 79.3 mg/l |

As shown by Table 5, this embodiment of the invention performed extremely well.

EXAMPLE 7

The device shown by FIGS. 20–23 was produced as described above. The first chemical unit 112 and second chemical unit 130 were stuck together by peeling the paper off the adhesive strip 140 on the first unit and pressing the units together. The compartment section 118 of the first chemical unit 120 contained approximately 50 grams of technical grade sodium chloride. The compartment section 136 of the second chemical unit 130 contained approximately 25 grams of technical grade, anhydrous citric acid. Double-sided adhesive tape was used to form the adhesive strip 140. The device 20 was then placed in a five-gallon container of tap water. It was observed that chlorine dioxide was generated over time and in an amount similar to the device described in Example 3 above.

The preceding examples can be repeated with similar success by substituting the generically or specifically described components and operating conditions of this invention for those used in the examples.

Although certain preferred embodiments of the invention have been described for illustrative purposes, it will be appreciated that various modifications and innovations of the inventive device may be effected without departure from the basic principals which underlie the invention. Changes of this type are therefore deemed to lie within the spirit and scope of the invention except as may be necessarily limited by the inventive claims and reasonable equivalents thereof

What is claimed is:

1. A device for producing an aqueous chlorine dioxide solution when exposed to water comprising:

a membrane shell defining a compartment which includes one or more dry chemical components capable of producing chlorine dioxide gas when exposed to water; and

wick means connected to said membrane shell and extending into said compartment for absorbing water and transporting water into said compartment whereby when said wick is exposed to water said wick means absorbs water and transports water into said compartment, said chemical component(s) dissolve in the water and produce chlorine dioxide gas in said compartment, and chlorine dioxide gas exits said compartment through said membrane shell.

2. The device of claim 1 wherein said membrane shell is substantially impervious to liquid and permeable to gas.

3. The device of claim 1 wherein said membrane shell is permeable to liquid and gas.

4. The device of claim 1 wherein said membrane shell is formed of a material selected from the group consisting of polyethylene and polypropylene sheet materials.

5. The device of claim 4 wherein said membrane shell is formed of a microporous, non-woven polyethylene sheet material.

6. The device of claim 1 wherein said wick means is a wick member formed of a material selected from the group consisting cotton pulp and wood pulp.

22

7. The device of claim 6 wherein said wick member is formed of a non-synthetic fibrous cotton material.

8. The device of claim 1 wherein said compartment includes a metal chlorite component and an acid component whereby when water is transported into said compartment metal chlorite and acid in said compartment dissolve in the water and react to produce chlorine dioxide in said compartment.

9. The device of claim 8 wherein said metal chlorite component comprises a metal chlorite selected from the group consisting of alkali metal chlorites and alkaline earth metal chlorites.

10. The device of claim 9 wherein said metal chlorite component comprises a metal chlorite selected from a group consisting of sodium chlorite, potassium chlorite, barium chlorite, calcium chlorite and magnesium chlorite.

11. The device of claim 10 wherein said metal chlorite component is sodium chlorite.

12. The device of claim 8 wherein said acid component comprises an acid selected from the group consisting of citric acid, lactic acid, tartaric acid, maleic acid, malic acid, glutaric acid, adipic acid, acidic acid, sulfamic acid, formic acid, sulfuric acid, hydrochloric acid and phosphoric acid.

13. The device of claim 12 wherein said acid component is citric acid.

14. The device of claim 8 wherein said acid component comprises an acid precursor that produces an acid when exposed to water.

15. The device of claim 1 wherein said wick means is a wick member having a first end which extends into said compartment and an opposing second end which extends beyond the outer edge of said membrane shell.

16. The device of claim 1 wherein said membrane shell comprises two panel members fastened together to form said compartment.

17. The device of claim 16 wherein said wick means is a wick member which is positioned between and fastened to at least one of said panel members and divides said compartment into first and second compartment sections.

18. The device of claim 17 wherein at least 15% of the outer periphery of said wick member extends beyond the outer periphery of said membrane shell.

19. The device of claim 17 wherein the entire outer periphery of said wick member extends beyond the outer periphery of said membrane shell.

20. The device of claim 17 wherein said compartment includes a metal chlorite component and an acid component, said metal chlorite component being contained within said first compartment section and said acid component being contained within said second compartment section.

21. The device of claim 1 wherein said wick means is a wick member which divides said compartment into first and second compartment sections.

22. The device of claim 21 wherein said compartment includes a metal chlorite component and an acid component, said metal chlorite component being contained within said first compartment section and said acid component being contained within said second compartment section.

23. The device of claim 21 wherein said compartment includes a mixture of a metal chlorite component and an acid component, a portion of said mixture being contained within said first compartment section and a portion of said mixture being contained within said second compartment section.

24. The device of claim 22 further comprising a manually openable ampule, said ampule being positioned in said second compartment section and containing said acid component, said ampule being impervious to water and

US 6,764,661 B1

23

preventing said acid component from coming into contact with said metal chlorite component until said ampule is manually opened.

**25.** The device of claim 22 further comprising a manually openable ampule, said ampule being positioned in said first compartment section and containing said metal chlorite component, said ampule being impervious to water and preventing said metal chlorite component from coming into contact said acid component until said ampule is manually opened.

**26.** The device of claim 21 wherein:

said first compartment section includes a metal chlorite component, said metal chlorite component being sealed in said first compartment section; and

said second compartment section includes an sealable opening therein for allowing an acid component to be placed in said second compartment section prior to exposure of said device to water.

**27.** The device of claim 21 wherein:

said first compartment section includes an acid component, said acid component being sealed in said first compartment section; and

said second compartment sections includes a sealable opening therein for allowing a metal chlorite component to be placed in said second compartment section prior to exposure of said device to water.

**28.** The device of claim 1 wherein said compartment includes a metal chlorite component and an acid component, and said device further comprises a manually openable ampule, said ampule being positioned in said compartment and containing said acid component, said ampule being impervious to water and preventing said acid component from coming into contact said metal chlorite component until said ampule is manually opened.

**29.** The device of claim 1 wherein said compartment includes a metal chlorite component and an acid component, and said device further comprises a manually openable ampule, said ampule being positioned in said compartment and containing said metal chlorite component, said ampule being impervious to water and preventing said metal chlorite component from coming into contact said acid component until said ampule is manually opened.

**30.** The device of claim 1 wherein said compartment includes a metal chlorite component and has a sealable opening therein for allowing an acid component to be placed in said compartment prior to exposure of said device to water.

**31.** The device of claim 1 wherein said compartment includes an acid component and has a sealable opening therein for allowing a metal chlorite component to be placed in said compartment prior to exposure of said device to water.

**32.** The device of claim 1 wherein said wick means is a wick member which divides said compartment into a plurality of compartment sections.

**33.** The device of claim 1 wherein said wick means comprises at least two wick members, said wick members dividing said compartment into at least two compartment sections.

**34.** The device of claim 1 further comprising weight means attached to one of said membrane shell and said wick means for causing said device to sink when placed in a body of water.

**35.** The device of claim 1 further comprising a water-resistant package surrounding and enclosing said membrane shell and said wick means.

**36.** The device of claim 1 wherein said membrane includes a plurality of openings therein for facilitating the passage of liquid into and out of said device.

24

**37.** A device for producing an aqueous chlorine dioxide solution when placed in water comprising:

a membrane shell defining a compartment, said membrane shell allowing the passage of chlorine dioxide gas from said compartment but being impervious to water, said compartment including a metal chlorite component and an acid component;

a wick member connected to said membrane shell, said wick member extending into said compartment and dividing said compartment into a first compartment section containing said metal chlorite component and a second compartment section containing said acid component, said wick member being capable of absorbing water and transporting water into said first and second compartment sections whereby when said device is placed in water said wick member absorbs water and transports water into said compartment, said metal chlorite and acid dissolve in the water, traverse said wick divider, and react to produce chlorine dioxide gas in said compartment, and chlorine dioxide gas passes through said membrane shell.

**38.** The device of claim 37 wherein said membrane shell is formed of a material selected from the group consisting of polyolefin sheet materials.

**39.** The device of claim 37 wherein said wick member is formed of non-synthetic fibers of cotton.

**40.** The device of claim 37 wherein said wick member includes a first end which extends into said compartment and an opposing second end which extends beyond the outer edge of said membrane shell.

**41.** The device of claim 37 wherein said wick member extends through said compartment and includes a first end extending beyond the outer edge of one side of said membrane shell and a second end extending beyond the outer edge of a second side of said membrane shell.

**42.** The device of claim 37 wherein the entire outer periphery of said wick member extends beyond the outer periphery of said membrane shell.

**43.** The device of claim 28 wherein said membrane shell comprises two panel members fastened together to form said compartment.

**44.** The device of claim 43 wherein said wick member is sandwiched between said panel members.

**45.** The device of claim 37 further comprising a manually openable ampule, said ampule being positioned in said second compartment section and containing said acid component, said ampule being impervious to water and preventing said acid component from coming into contact with said metal chlorite component until said ampule is manually opened.

**46.** The device of claim 37 further comprising a manually openable ampule, said ampule being positioned in said first compartment section and containing said metal chlorite component, said ampule being impervious to water and preventing said metal chlorite component from coming into contact said acid component until said ampule is manually opened.

**47.** The device of claim 37 wherein:

said first compartment section includes a metal chlorite component, said metal chlorite component being sealed in said first compartment section; and

said second compartment section includes a sealable opening therein for allowing an acid component to be placed in said second compartment section prior to placement of said device in water.

**48.** The device of claim 37 wherein:

said first compartment section includes an acid component, said acid component being sealed in said first compartment section; and

US 6,764,661 B1

25

26

said second compartment sections includes an sealable opening therein for allowing a metal chlorite component to be placed in said second compartment section prior to placement of said device in water.

**49.** The device of claim **37** further comprising means attached to one of said membrane shell and said wick member for causing said device to sink when placed in a body of water.

**50.** The device of claim **37** further comprising a water-resistant package surrounding and enclosing said membrane shell and said wick member.

**51.** The device of claim **37** wherein said membrane shell includes a plurality of openings therein for facilitating the passage of liquid into and out of said device.

**52.** A kit for allowing a device for producing an aqueous chlorine dioxide solution when the device placed in water to be assembled at the point of use comprising:

a first chemical unit including:

a first membrane shell;

a first wick member connected to said first membrane shell and forming a first compartment section between said first membrane shell and said first wick member, said first compartment section containing a metal chlorite component, said first wick member being capable of absorbing water and transporting water into said first compartment section;

a second chemical unit including:

a second membrane shell;

a second wick member connected to said second membrane shell and forming a second compartment section between said second membrane shell and said second wick member, said second compartment section containing an acid component, said second wick member being capable of absorbing water and transporting water into said second compartment section; and

means attached to at least one of said first chemical unit and said second chemical unit for attaching said first and second chemical units together to assemble said device, whereby when said device is placed in water said first and second wick members absorb water and transport water into said first and second compartment sections, metal chlorite in said first compartment section and acid in said second compartment section contact the water, dissolve in the water, traverse the wick dividers, and react to produce chlorine dioxide in said compartment sections, and said chlorine dioxide passes from said compartment sections through said first and second membrane shells into the water into which the device is placed.

**53.** The device of claim **52** wherein said first and second membrane shells are formed of a material that is substantially impervious to liquid but allows the passage of gas.

**54.** The device of claim **52** wherein said first and second membrane shells are formed of a material that allows the passage of liquid and gas.

**55.** The device of claim **52** wherein said first and second wick members each include at least one end which extends beyond the outer edge of said corresponding membrane shell.

**56.** The device of claim **52** wherein the entire outer periphery of each of said first and second wick members extends beyond the outer periphery of said corresponding membrane shell.

**57.** The device of claim **52** wherein said means for attaching said first and second units together includes adhesive material attached to at least one of said first and second wick members.

*    *    *    *    *

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that copies of the foregoing **BRIEF FOR ODORSTAR TECHNOLOGY LLC AND KINPAK, INC.** were served upon registered counsel by operation of the Court's CM/ECF system on this 16th day of July, 2014.


/s/Donna Stockton
Donna Stockton

## **CERTIFICATE OF COMPLIANCE**

I certify that the foregoing **BRIEF FOR ODORSTAR TECHNOLOGY**

**LLC AND KINPAK, INC.** contains 11,028 words as measured by the word-

processing software used to prepare this brief.

Dated: July 16, 2014                    Respectfully submitted,


/s/Patrick J. Coyne
Patrick J. Coyne